## TRANSAMERICA CORPORATION v. UNITED STATES.

### No. 45940.

Court of Claims.

May 6, 1946.

George H. Koster, of San Francisco, Cal. (Llewellyn A. Luce, of Washington, D.C., on the brief), for plaintiff.

J. W. Hussey, of Washington, D.C., and Sewall Key, Acting Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D.C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

The plaintiff, herein sometimes referred to as "Transamerica," seeks to recover an alleged overpayment of income tax of approximately $60,000, on account of an additional assessment in 1940 for the year 1936, the exact overpayment to be stipulated by the parties, on the basis of the decision of the court if plaintiff is held entitled to recover on the issue presented as to the deductibility of certain amounts totalling $805,376.76, as ordinary and necessary business expenses. During 1936, the plaintiff, under and by reason of an advertising and publicity program and campaign, as disclosed by the facts set forth in the findings and hereinafter summarized, paid out and deducted from gross income for 1936, under section 23(a), Revenue Act of 1936, a total of $1,124,724.78 as an ordinary and necessary expense of carrying on its business.

As set forth in findings 4–8, the Commissioner of Internal Revenue, in May 1939, assessed a deficiency of $57,645.65, with interest, on the basis of an audit report by the Internal Revenue Agent in Charge, filed August 29, 1938. In that additional assessment the amount of $402,688.38 of the expense item of $805,376.76, here involved, was excluded from gross income as was a further amount of $319,348.02 of the deduction of $1,124,724.78 claimed by plaintiff on the original return. In the report, on the basis of which this additional assessment was made, the Internal Revenue Agent in Charge and plaintiff had agreed, after a number of conferences, upon a basis of settlement of the controversy, subject to the approval of the Commissioner, wherein the amount of $722,036.40 of the total deduction of $1,124,724.78 claimed by plaintiff would be allowed. On the basis of this proposed settlement plaintiff signed a Form 870, "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax" of $57,645.65, as so computed by the Agent in Charge. The Com-

missioner, although assessing the deficiency shown in the report, did not approve this proposed settlement and in February 1940 (finding 11), made his final determination for 1936, and allowed as a deduction from gross income only the amount of $319,348.02 of the total claimed deduction of $1,124,724.78 and disallowed as a deduction the amount of $805,376.76 thereof. Plaintiff was sent a ninety-day deficiency notice of a further additional tax of $60,403.25. Plaintiff elected not to institute a proceeding before the Tax Court and such deficiency, together with statutory interest of $11,836.21, was assessed and paid June 28, 1940. A claim for refund was filed and rejected August 28, 1941, as to the claimed overpayment based on the deduction of the amount of $805,376.76 here in question.

The question presented is whether this portion of $805,376.76 of the total expenditure of $1,124,724.78 in 1936 was, in the circumstances, a capital expenditure in the purchase or sale of stock under Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L. Ed. 52; Spreckels v. Helvering, 315 U.S. 626, 62 S.Ct. 777, 86 L.Ed. 1073; Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L. Ed. 397, and Deputy v. Dupont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416, or whether it was an ordinary and necessary expenditure, in the nature of advertising and publicity expense, in connection with the carrying on of the business in which plaintiff was engaged. We are of opinion that the cases above mentioned and relied on by defendant are not applicable on the facts and that the expenditure in question was an ordinary and necessary business expense within the meaning of that term as used in section 23(a) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 23(a), for the same reasons that prompted and justified the allowance of the amount of $319,348.02 of the total expenditure, as a proper ordinary and necessary business expense. Both amounts were expended for the same purpose and in carrying out a definite advertising and publicity plan and campaign to accomplish specific business objectives.

The reasons for the advertising and publicity plan and campaign inaugurated and carried out by plaintiff were to increase its income and that of its stockholders from the business in which it was regularly engaged, as hereinafter more fully set forth.

Plaintiff is and at all times since its organization, has been a holding company owning, directly or through wholly owned subsidiary companies, all or substantially all of the capital stock of a large number of corporations engaged in banking, insurance, real estate, and other businesses. In 1936, plaintiff had over 21,000,000 shares of its capital stock outstanding in the hands of over 200,000 stockholders in every state of the Union, in Hawaii and Alaska, and in a number of foreign countries. However 81 percent of the stockholders were in California and held 86.5 per cent of the stock. Plaintiff's ownership of stock in subsidiary companies as of November 30, 1936, was as follows:

| Investment in capital stocks of— | Percent control | Value |
|---|---|---|
| Bank of America N. T. & S. A. | 99.65 | $103,928,254.01 |
| Bank of America (California) | 98.99 | 3,878,696.00 |
| Banca d'America e d'Italia | 89.65 | 8,982,180.20 |
| First National Bank of Reno | 99.00 | 695,500.00 |
| The First National Bank of Portland | 41.53 | 2,095,885.75 |
| The First National Corporation of Portland | 73.90 | 1,163,055.68 |
| The California Joint Stock Land Bank of San Francisco | 100.00 | 1,418,674.16 |
| Country Banks | Various | 616,781.69 |
| Capital Company | 100.00 | 17,537,931.98 |
| California Lands Inc. | 100.00 | 13,831,705.38 |
| Bankamerica Agricultural Credit Corporation | 100.00 | 1,088,862.17 |
| Bankamerica Company | 100.00 | 600,000.00 |
| Pacific National Fire Insurance Company | 100.00 | 2,268,798.72 |
| Occidental Life Insurance Company | 100.00 | 1,127,600.28 |
| General Metals Corporation | 50.70 | 969,214.15 |
| Miscellaneous | 100.00 | 439,656.75 |

In 1936 the largest stock ownership by plaintiff in terms of capital invested and business transacted was the Bank of America National Trust and Savings Association, which operated a 400-branch statewide banking system in the State of California. The Capital Company and California Lands, Inc., engaged in the urban and rural real estate businesses respective-

ly. The Occidental Life Insurance Company engaged in the life insurance business in twenty-six states of the Union, in Canada, Alaska, Hawaii, Philippine Islands, and the treaty ports of China. Pacific National Fire Insurance Company engaged in the fire and inland marine insurance business, and in 1936 was doing business in every state of the Union, in Alaska, Hawaii, and the District of Columbia. The First National Bank of Reno, Nevada, and the First National Bank of Portland, Oregon, were engaged in branch banking in those states.

Transamerica's principal source of income was dividends received from subsidiary companies, the consolidated net profit of plaintiff and its subsidiary companies for 1936 amounting to $25,016,200.95. The largest income producer in the group was the Bank of America National Trust and Savings Association and its affiliated State banks. The net profits and the dividends of this bank for 1929 to 1936 were as follows:

| Year | Net profits | Dividends paid |
|------|------------|----------------|
| 1929 | $12,242,014.25 | $9,753,557.05 |
| 1930 | 8,898,119.89 | 10,000,000.00 |
| 1931 | 5,485,251.79 | 7,200,000.00 |
| 1932 | 6,198,034.21 | |
| 1933 | 7,101,618.94 | 2,325,000.00 |
| 1934 | 9,038,053.44 | 3,851,250.00 |
| 1935 | 14,342,984.84 | 6,100,000.00 |
| 1936 | 19,146,906.16 | 8,100,000.00 |

In 1930, A. P. Giannini, then chairman of the board of directors of Transamerica, resigned such position and was succeeded by Elisha Walker, who became chief executive officer of the corporation. In late 1931, a change in policy inaugurated by Walker created dissatisfaction among Giannini and many stockholders, with the result that Giannini became a candidate for the chairmanship of the board of directors. A vigorous campaign was conducted by each of the contending factions to secure proxies authorizing the voting of plaintiff's stock at the annual meeting of stockholders to be held in February 1932. This campaign was widely publicized, receiving much newspaper publicity throughout the nation and particularly in California. Each faction sent letters to stockholders in which were made charges and countercharges of mis-

management of the corporation. Pre-election meetings of various groups of stockholders, organized by both factions, were held in many parts of California and in some places in the eastern part of the United States, where charges of mismanagement under the opposing factions were aired. Some phases of the dispute found their way into court.

At the annual meeting of the stockholders February 15, 1932, Giannini received a majority of the votes cast, members of his faction were elected to the board of directors, and he became chairman of the board.

As a result of the situation thus created the reputation of Transamerica and of the Bank of America and other companies of the consolidated group was badly damaged and was at a low ebb in 1932. Deposits in the Bank of America dropped from over $1,000,000,000 as of December 31, 1930, to $799,220,729.46 on December 31, 1931, and to $749,658,304.53 as of December 31, 1932. Loans and discounts dropped from $701,030,885.99, as of December 31, 1930, to $577,566,169.33 as of December 31, 1931, and $507,873,016.56 as of December 31, 1932.

The situation was aggravated by the general economic depression of that time and, in particular, by activity on the part of certain security dealers, who had obtained lists of stockholders of Transamerica and who, in an endeavor to induce such stockholders to sell their Transamerica stock and buy other stocks offered by such dealers, made damaging representations to the public that Transamerica and its subsidiaries were insolvent and that their stocks were worthless. Many rumors detrimental to the reputation of Transamerica were spread among the public and among its stockholders. The large volume of sales of Transamerica stock depressed the market price and as a consequence public confidence in Transamerica declined and there was reluctance on the part of the public to patronize the companies whose stocks plaintiff owned.

Upon resuming the management of Transamerica, the Giannini group first attempted to counteract these adverse influences by newspaper advertisements, but

concluded that this method was ineffective. Thereupon plaintiff devised a plan of personal contact with the stockholders and with the public generally through the use of the Associated American Distributors (Incorporated), herein referred to as AAD, which, at all times here involved, was a Delaware corporation with its capital stock owned wholly, directly or indirectly, by Transamerica.

The plan for rehabilitation of plaintiff's standing and reputation in the business world and with the public generally was an advertising and stock redistribution plan under which AAD, through salesmen and security dealers employed by it, solicited orders from third persons for the purchase by such persons of Transamerica stock over recognized security exchanges. Until the year 1933, AAD had been dealing and trading in Transamerica and other stock for its own account, realizing gross profits or losses as its sale prices exceeded or were less than its cost prices for such stock. After July 16, 1933, it discontinued this business and did not buy or sell any stock for its own account but devoted its activities exclusively to the operations and for the purposes of the plan herein described. It was dissolved at the end of 1936.

Neither AAD nor any of the Transamerica group bought for its own account or sold any Transamerica stock under the plan. AAD merely caused the solicitation of orders only for the purchases of stock by third persons, the orders given being executed on national security exchanges for the personal account of the purchasers.

The principal object of the plan was to create and restore public confidence in Transamerica and to get Transamerica stock distributed as broadly as possible and to cause Transamerica stock on sale on the market to be placed in the hands of persons who, it was designed and hoped, would become permanent stockholders of Transamerica and customers of the subsidiary companies. Transamerica knew that much of its outstanding stock was in "weak hands," that is, held by persons who would be compelled to liquidate, and plaintiff wanted to get the stock into stronger ownerships which would improve its business, its standing and income. The ultimate object was to create as much interest as possible in Transamerica enterprises, to recapture business which had left the Transamerica consolidated companies, to secure new business for the companies, to improve the relationship of plaintiff and all the companies with the public, and to advertise and publicize Transamerica and its subsidiaries, thus to improve the financial condition of the consolidated group and advance the earnings. The plan also contemplated that the market value of Transamerica stock would be increased.

December 31, 1932, the subsidiary companies had held 767,071 shares as collateral security for loans totaling $10,359,166.12. On December 31, 1935, the Bank of America held 1,193,143 shares of stock of Transamerica as collateral security for loans aggregating $7,225,513. At the same time other subsidiary companies in the aggregate held 531,588 shares as collateral security for loans totaling $6,010,321.51.

As a means of accomplishing these purposes, AAD strove to induce persons to become stockholders of Transamerica, to gain customers for the subsidiary companies, to clear up misunderstandings on the part of the public and of customers concerning the affairs and businesses of Transamerica and its subsidiary companies, to refute and offset adverse rumors and misrepresentations, to disseminate favorable and correct information and generally to advertise and publicize in a favorable manner the operations of the consolidated group by the distribution of printed matter, by word of mouth and personal contact, and by other means.

The Bank of America was the most important of the operating subsidiaries and, as a result of the proxy fight, the personnel was in a depressed mood and in a state of confusion. The first task in general rehabilitation was to restore the confidence and morale of the personnel of the Bank and then to school them in the art of salesmanship and in a program of deposit building. For this purpose personal contact was made with them by the officers and salesmen of AAD, who conducted many meetings at night.

The Bank had lost nearly half its depositors between 1930 and 1933 and for the purpose of restoring public confidence, AAD salesmen secured the names of depositors who had withdrawn their accounts from the Bank, and of former Transamerica stockholders who had sold their stock, and of all stockholders who were known to have expressed complaints or doubts concerning the management of the companies. The salesmen then attempted to restore the confidence of the former depositors and to induce them to reopen their accounts, as well as to buy Transamerica stock. They solicited orders for Transamerica stock from former owners and explained matters relating to Transamerica and its companies about which there were complaints or misunderstandings.

AAD, in addition to advertising the stability and financial standing of plaintiff by personal contacts, caused to be produced a motion picture graphically and favorably depicting the operations and structure of Transamerica in relation to the economic and social progress of the people of the State of California, which was exhibited to over a million persons in 1936 by salesmen and officers of AAD and by branch managers of the Bank of America. It was shown to stockholders, to the personnel of subsidiary companies, to Rotary Clubs and similar organizations, and to other groups. There were over six hundred showings and, except in the case of very large audiences, records of attendance were kept and salesmen later interviewed the persons who attended for the purpose of soliciting orders for the purchase by such persons of Transamerica stock on the market and explaining the affairs of plaintiff and its companies. Sometimes there were talks and lectures following the exhibition of the picture with personal contacts and conferences with persons attending. AAD devoted all its time to this general program after 1933.

The business and earnings of the Transamerica companies and, in consequence, of Transamerica, improved between 1933 and 1936 as the result of the carrying out of this plan and program and the market value of plaintiff's stock also increased. Deposits in the Bank of America rose from approximately $749,658,304.53 at the end of 1932 to $1,325,080,396.27 at the end of 1936. The market value of Transamerica stock rose from $2 per share in 1932 to $18 per share in the latter part of 1936. The subsidiary insurance businesses, the Oregon and Nevada Banks, and the subsidiary land companies also showed marked improvement in business and earnings during the period 1933 to 1936 inclusive.

Of the orders for purchases on the open market totaling 1,944,899 shares of Transamerica stock solicited in 1936, 48.97 percent were secured by dealers employed by AAD and 51.03 percent were secured by salesmen of AAD. The security dealers performed no services for plaintiff or for AAD, except those incidental to solicitation and execution of orders for stock. The salesmen, in addition to soliciting orders for stock, comprised a large part of the operating forces of AAD engaged in carrying out the plan above described. Both the salesmen and security dealers were compensated solely by the payment of specified percentages on orders solicited, which compensation was called "commissions", but with conditions designed to eliminate payment of such "commissions" on orders from purely temporary buyers. It was the purpose of the plan to encourage only orders by persons who might be expected to become permanent investors and stockholders and who, therefore, would have a special interest in the improvement of the condition of the Transamerica and its subsidiaries.

The operating expense of AAD during the years of the operation of such plan included officers' salaries, advertising, insurance, legal expense, general office expenditures, postage, revenue stamps, other salaries, stationery, telephone, telegraph, traveling expenses, and sundry other items, but the largest item was compensation by way of commissions paid to salesmen and dealers. The amount of such compensation for 1936 was $805,376.76 and the amount of other expenses of the nature above described was $325,218.73, making a total expense of $1,130,595.49.

The sum of $5,870.71 from miscellaneous receipts by AAD was applied to the pay-

ment of these expenses, leaving a balance of $1,124,724.78, which was paid by Transamerica to AAD. This amount was characterized on the books of the two companies as "commissions," however, it was not determined by any fixed amount applied to the volume of orders solicited, but was determined by the amount necessary to defray the balance of actual expense of AAD for 1936, only 71 percent of which expense was called commissions paid by AAD to security dealers and salesmen, the amount of whose compensation or "commissions" was determined by agreed percentages applied to the volume of orders solicited by them respectively. For bookkeeping purposes plaintiff divided the total amount paid to AAD by the number of shares for which orders were solicited to compute a cost per share. On its books it then indicated the transaction as being the payment of commission to ADT on orders solicited for a certain number of shares purchased by the public on the market at a certain commission per share.

Plaintiff neither bought or took title to stock nor sold any stock which it owned. Neither did AAD buy or sell any stock to which it took or had title. The salesmen and dealers which AAD employed to help it carry out plaintiff's plan did not buy or sell stock on their own account, they were simply paid compensation for services rendered in connection with the plan hereinbefore described which compensation was, as to them, measured by a certain percentage of the orders obtained from persons for the purchase for their account of stock on the market. Such compensation was called "commissions," as the entire amount paid AAD by plaintiff was referred to for bookkeeping purposes, but that fact did not, in the circumstances make the amounts, totalling $805,376.76, paid such salesmen and dealers "brokerage commissions" or "sales commissions" such as are to be classified as capital expenditures and not deductible as ordinary and necessary expenses by a taxpayer who engaged in buying and selling securities. The persons who purchased Transamerica stock on the market through solicitation of AAD employes and representatives paid no commissions to anyone and they did not purchase the stock from plaintiff or AAD, since AAD did not at any time own any stock of Transamerica.

Defendant argues against the deductibility of the expenses here involved on the ground that "expenditures connected with sales of a corporate taxpayer's stock are capital expenditures and are not such ordinary and necessary expenses as to justify their deduction from income." However, that rule applies only where the transactions involved are of a capital nature, which was not the case here. In cases such as those hereinbefore cited and relied upon by defendant, the expenditures or commissions paid by the taxpayer concerned can, in the case of a purchase by such taxpayer, be added to his purchase price and later deducted from his sales price, and, in the case of a sale by a taxpayer of stock to which he has title, he may deduct such commissions from his sales price for the purpose of taxation on the gain derived or deduction of the loss sustained. That rule cannot be applied here, and in the circumstances it is not applicable. The carrying out by plaintiff and AAD of the plan here involved did not involve capital transactions within the meaning of the taxing statutes. The plan was primarily and essentially an advertising and publicity program and campaign based upon legitimate and reasonable methods of currently increasing and improving plaintiff's business and its income, and we think the expenditure here involved was, in the circumstances, an ordinary and necessary expense of carrying on the business in which plaintiff was engaged. A. Harris & Co. v. Lucas, 5 Cir., 48 F.2d 187. Cf. Commissioner v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.

So far the right of plaintiff to deduct the amount of $805,376.76 as an ordinary and necessary business expense is concerned we cannot, on the facts, distinguish this portion of the total amount of $1,124,724.78 paid by plaintiff to AAD from the balance of such payment amounting to $319,348.02 which defendant correctly allowed as a proper business expense deduction for 1936. The purpose for which the last mentioned sum was expended was the same as that for which the amount in question was paid

476

out. Other employes of AAD to whom large sums were paid rendered substantially the same services as were rendered by the salesmen and dealers employed by AAD so far as the carrying out of plaintiff's plan ánd program and the attainment of its objective were concerned. We think both amounts, totaling $1,124,724.78, were allowable under section 23(a), supra, as deductions from gross income for 1936.

It may be said from the facts disclosed by the record that an important part of the business of plaintiff, in addition to increasing its income as a holding company and in protecting and maintaining its standing with the public, was the formulation of business policies and programs in cooperation with various Transamerica consolidated business and enterprises and in promoting their successful operation from an income-producing standpoint.

Plaintiff is entitled to recover but the entry of judgment for the amount due is suspended to await the filing by the parties of a stipulation showing the amount of the overpayment computed in accordance with the foregoing opinion. It is so ordered.

WHALEY, Chief Justice, and JONES and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.