Norman J. FISCHER and Mary P. Fischer, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 72-1273.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1973.

Decided Dec. 28, 1973.

Kenneth K. Luce, Robert A. Schnur, Milwaukee, Wis., for plaintiffs-appellants.

Scott P. Crampton, Asst. Atty. Gen., James H. Bozarth, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, CUMMINGS, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

This income tax refund suit was commenced in the District Court for the Eastern District of Wisconsin by the plaintiffs, Norman J. and Mary P. Fischer.[1] The facts were either stipulated or agreed to by the parties, and

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. Mary P. Fischer is a party to this action by reason of her filing a joint tax return with her husband, Norman J. Fischer.

the trial resulted in a denial of the taxpayer's refund claim. We affirm.

The undisputed facts show that the taxpayer, Norman J. Fischer, was the president and a member of the board of directors of Medalists Industries Inc. (hereafter "Medalists"), and that he owned 12,015 shares of its common stock. Additionally, taxpayer had the right under a qualified stock option plan to purchase 25,000 shares of Medalists common stock at a price of $6.00 per share. Medalists, originally incorporated under the name of J. M. Nash Company, Inc., is a manufacturer of athletic equipment, automated woodworking machinery, ductile iron products, and other equipment.

Under an indenture dated April 1, 1960, Medalists issued subordinated debentures convertible into its common stock in the principal amount of $370,000.00. During 1967, outstanding convertible · debentures existed in the principal amount of $260,000.00 and they were owned by two small business investment companies and an individual.

From April, 1960 through June 30, 1967, the authorized common stock of Medalists equaled four million shares with a par value of one dollar per share. There were 1,729,000 shares outstanding as of June 30, 1967. On that date, Medalists' shareholders amended its Articles of Incorporation to effect a reverse stock split whereby the authorized common stock was reduced from four million shares to one million shares, with a resultant increase in the par value per share from $1.00 to $4.00. After the reverse stock split, there were 432,250 shares of Medalists common stock outstanding. A proxy statement was distributed to the Medalists shareholders with the notice of the June 30, 1967 meeting, and with reference to the convertible debentures, stated:

"The reduction in the outstanding shares of common stock and the accompanying exchange of shares will necessitate corresponding adjustments in the conversion price at which the $6\frac{1}{4}\%$ convertible subordinated debentures may be converted into the common stock of the company."

On June 30, 1967 Medalists notified the debenture holders that it intended to redeem the debentures on the next interest paying date, October 1, 1967.

Shortly thereafter, on about July 27, 1967, two of the debenture holders asserted that there was no provision in the April 1, 1960 debenture indenture for an adjustment of the conversion price of the debentures in the event of a reverse stock split. The debenture holders claimed that they were entitled to convert their debentures into 91,550 shares of common stock at the conversion price of $2.84 per share, irrespective of the reverse stock split. Medalists denied the claim and maintained that the conversion price should be for 22,887 shares of common stock at a price of $11.36 per share.

There followed a period of negotiations and threats of litigation, after which a settlement was reached on or about September 18, 1967. The terms of the settlement provided that Medalists would purchase the debentures from the holders for $457,740.00 plus interest.

Although this settlement was consummated on or about September 26, 1967, it was originally rejected by the debenture holders. In order to induce the debenture holders to enter into the settlement, the taxpayer offered to sell and did sell to them on September 26, 1967, 2250 shares of his common stock for $4.-20 per share.[2] At the time of the sale by the taxpayer, the stock in the O–T–C market had a value of $16.625 per share.

2. As a part of his inducement, a Mr. Harmon J. Jongebloed, a director and substantial stock holder in the corporation who is not involved in this litigation, also agreed to sell 1250 shares of his common stock in Medalists to the debenture holders for $4.20 per share.

The taxpayer's purpose or motive in acceding to this transaction was also adduced in the District Court. At the time of the transaction, the taxpayer was aware that the company's board of directors was dissatisfied with his role in the situation and believed that it was his negligence which had caused the problem. Unless the dispute was settled, the taxpayer understood that his resignation would be demanded. He also thought that the resulting publicity would adversely affect his business reputation and jeopardize his future as a corporate executive. Moreover, since the taxpayer had a stock interest in Medalists valued at $630,000, if the debenture holders prevailed in the dispute, the value of his interest in Medalists would be substantially diluted. It was also shown that this dispute was interfering with the company's active acquisition program, and that the publicity attending the dispute might reduce the public's confidence in the company, all of which might adversely affect the value of the company's stock, including the taxpayer's interest therein.

Upon these facts, taxpayer filed his claim for refund, asserting that he was entitled to deduct the full amount of the difference between the fair market value of the common stock and the price at which he sold the shares to the debenture holders on September 26, 1967. The deduction is authorized, the taxpayer maintains, either as a business expense pursuant to Section 162,[3] or as an expense incurred for the maintenance or conservation of property held for the production in income pursuant to Section 212 [4] of the Internal Revenue Code. As stated, the District Court denied the taxpayer's claim for refund and this appeal followed.

Although the District Court held otherwise, the government now concedes that for tax purposes a salaried corporate officer is engaged in a trade or business separate and distinct from that of his corporation, the business of rendering services for compensation. Noland v. Commissioner, 269 F.2d 108, 111 (4th Cir. 1959); Folker v. Johnson, 230 F.2d 906, 908–909 (2d Cir. 1956). Thus, Section 162 will authorize a deduction by a corporate employee for expenditures which are "ordinary and necessary" to the continuation of his employment. In this regard, the court in *Noland* remarked:

> ". . . . every person who works for compensation is engaged in the business of earning his pay, and that expense which is essential to the continuance of his employment is deductible . . . The business of a corporation, however, is not that of its officers, employees or stock holders. Though the individual stock holder—executive, in his own mind, may identify his interests and business with those of the corporation, they legally are distinct, and, ordinarily, if he voluntarily pays or guarantees the corporation's obligations, his expense may not be deducted on his personal return. [Citations]" Noland v. Commissioner, 269 F.2d 108, 111 (4th Cir. 1959).

Thus, where a corporate executive or employee undertakes to discharge the responsibility of the corporation, he is not incurring an expenditure of *his* trade or business within the meaning of Section 162. See also, Deputy v. duPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). Following a similar rationale, it has been recognized that where a corporate officer pays the debts of his em-

---

3. In pertinent part, Section 162 of the Internal Revenue Code provides:
   "(a) *In General.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, . . . "

4. In pertinent part, Section 212 of the Internal Revenue Code provides:

"In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
(1) . . .
(2) for the management, conservation, or maintenance of property held for the production of income; . . .

ployer-corporation, however "necessary" that may be from a practical standpoint, such payments are not "ordinary" expenditures of the corporate officer. See Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212 (1933).

■ In the case at bar, the claim which prompted the taxpayer's sale of his stock was a claim against Medalists, the taxpayer's employer-corporation. The basis of the debenture holders' claim against Medalists lay in the corporation's obligation under the indenture agreement dated April 1, 1960. The obligation under that agreement related to the business of the corporation, not the trade or business of the taxpayer, although his status would concededly be affected thereby. Although taxpayer, in his own mind, might have felt compelled to participate in the settlement agreement, the expenditures he incurred were not thereby attributable to his trade or business within the meaning of Section 162.

■■ With respect to Section 212 of the Internal Revenue Code, the taxpayer maintains that he sold his stock at his cost[5] in order to protect his investment in Medalists and that, therefore, he may deduct the loss of the unrealized capital gain as an expense under this Section. To qualify as a deduction under Section 212, the expenditure must satisfy the same requirements that apply to a trade or business expense under Section 162 except that the person claiming the deduction need not be in the trade or business. See United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963). Also, where the expense is litigation related, the origin and character of the claim which generated the expense, rather than the potential consequence of the claim upon the taxpayer, will determine whether the expense is deductible under Section 212. Anchor Coupling Co. v. United States, 427 F.2d 429 (7th Cir. 1970); cert. denied, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971); see also, Clark Oil and Refining Corp. v. United States, 473 F.2d 1217 (7th Cir. 1973).

■ In the case before us, the origin of the claim concerning the sale of the taxpayer's stock was a threatened suit by Medalists' debenture holders against the corporation itself. It related to Medalists' financing operation and not to the taxpayer's personal stock dealing. Although the potential harm to the taxpayer's status and reputation as a corporate executive was not insignificant, the deductibility of an expense under Section 212 does not turn upon the possible consequences of a claim to the fortunes of the taxpayer. For these reasons, we hold that Section 212 does not authorize a deduction by the taxpayer of the loss of the unrealized capital gain caused by the sale of his stock to the debenture holders.[6]

Since we have concluded that the claimed expense here was not deductible under either Section 162 or Section 212

---

5. The $4.20 per share figure at which the taxpayer sold his stock to the debenture holders was equal to his cost basis of the stock.

6. Contrary to the view expressed in Judge Cummings' dissenting opinion, I do not consider our ruling in the instant case to be inconsistent with the position expressed in my dissenting opinion in Anderson v. Commissioner, 480 F.2d 1304, 1309 (7th Cir. 1973). As Judge Cummings correctly observes "Anderson held that the rule of Arrowsmith v. Commissioner, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6, required *what might otherwise be*

*ordinary expenses* to be treated as a capital loss because, on the particular facts of that case, they were essentially a refund of a previous capital gain." (emphasis added).

The distinction between our holding in the instant case and my dissent in *Anderson* is basically that *Anderson* involved what was quite clearly the taxpayer's personal tax liability, i. e., payment of "what otherwise might be ordinary expense." The instant case involves payment by the taxpayer of his *employer's obligation* under an indenture agreement. It is this distinction which renders Sections 162 and 212 inapplicable.

of the Internal Revenue Code, the judgment of the district court is affirmed.[7]

Affirmed.

CUMMINGS, Circuit Judge (dissenting).

The expense incurred was ordinary and necessary for the reasons stated in Judge Campbell's dissenting opinion in Anderson v. Commissioner: "The taxpayer's payment * * * was made to preserve his employment and to avoid injury to his business reputation * * *." 480 F.2d 1304, 1309 (7th Cir. 1973). The majority in *Anderson* did not disagree with the dissent on this point; instead *Anderson* held that the rule of Arrowsmith v. Commissioner, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6, required what might otherwise be ordinary expenses to be treated as a capital loss because, on the particular facts of that case, they were essentially a refund of a previous capital gain. The expense incurred here is not in the nature of a refund, and *Arrowsmith* is therefore inapplicable.

The Government also argues that no expense was incurred because the stock was sold at a price equal to the taxpayer's basis. The taxpayer is entitled to a deduction based on the fair market value of the property transferred, but he must also recognize the long-term capital gain implicit in disposition of the property. United States v. General Shoe Corp., 282 F.2d 9 (6th Cir. 1960), certiorari denied, 365 U.S. 843, 81 S.Ct. 801, 5 L. Ed.2d 808; International Freighting Corp., Inc. v. Commissioner, 135 F.2d 310 (2d Cir. 1943). Since the Government has not counterclaimed for the capital gains tax, that issue is not before us. Accordingly, I would allow the deduction as claimed.

---

7. In its brief, the government has also argued that the taxpayer here has not "paid or incurred" any expense since the $4.20 per share figure at which he sold his stock to the debenture holders was precisely equal to his per share cost basis in the stock. In other words, the government maintains that the loss of an unrealized gain is not an "expense" within Section 162 or Section 212. Since we have disposed of the appeal on other grounds, we intimate no views as to this issue.