MAURICE M. STERN and JUNE B. STERN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stern v. Commissioner
Docket No. 7833-74.
United States Tax Court
T.C. Memo 1976-245; 1976 Tax Ct. Memo LEXIS 161; 35 T.C.M. (CCH) 1061; T.C.M. (RIA) 760245; August 9, 1976, Filed *161 P, a shareholder and operations manager of the Buccaneers, made loans to the corporation and guaranteed other loans obtained by it. Such loans became worthless. Held, some of such loans were made to maintain his position as operations manager; others were not. Donald W. Doyle, for the petitioners. Robert E. Glanville, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Year
Deficiency
1967
$18,610.55
1968
16,962.84
1969
3,161.61
1970
6,403.19
1971
6,916.24
The principal issue to be decided is whether certain debts which became worthless during 1970 and 1971 were nonbusiness debts within the meaning of section 166(d) (2) of the Internal Revenue Code of 1954. [1] We must also determine whether certain payments made by the petitioner *163 to or on behalf of the New Orleans Buccaneers, Inc., resulted in bad debts. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Maurice M. and June B. Stern, were married during the years in issue and had their legal residence in New Orleans, La., at the time of filing their petition herein. They filed their joint Federal income tax returns for the years 1967 through 1971 with the Internal Revenue Service Center, Austin, Tex. Mr. Stern will sometimes be referred to as the petitioner. The petitioner has been engaged in the insurance business as a life insurance agent since 1948. He actively participated in organizations and institutes relating to the life insurance industry, and had become a chartered life underwriter. The volume of life insurance sold by him during the years 1965 through 1973 was as follows: Year
Volume
1965
$1,308,482
1966
1,272,189
1967
965,233
1968
588,524
1969
615,224
1970
731,190
1971
1,425.017
1972
1,690,236
1973
1,502,605
During the years 1967 *164 through 1971, the petitioner earned approximately $22,500 per year, after expenses, from insurance commissions. He owned extensive investments and was the beneficiary of a substantial trust, and received approximately $23,000 per year in dividend and trust income. The petitioner estimated that the net value of his assets during this period was between $1,000,000 and $2,000,000. In March 1967, the New Orleans Buccaneers, Inc. (Buccaneers), was organized to obtain, own, and operate a franchise in the American Basketball Association (ABA). The petitioner had no connection with or financial interest in the Buccaneers when it was first organized. However, shortly after its organization, Charles G. Smither, the president of the Buccaneers and a business associate and long-time friend of the petitioner, approached him concerning his participation in the ownership of the Buccaneers. As a result, the petitioner purchased 50 shares of stock for $5,000 on April 6, 1967. Prior to his investment, the petitioner indicated to Mr. Smither an interest in participating in the business affairs of the Buccaneers, particularly in the promotion, public relations, and sales areas. After his investment, *165 he began doing so on a part-time basis and was elected a director and treasurer of the Buccaneers on July 6, 1967. The petitioner had always been an avid sports fan and was excited about the prospect of becoming actively involved with professional basketball. During the 1967-1968 season, he gradually became connected with the Buccaneers as an unofficial operations manager, without a salary. On May 1, 1968, the petitioner was hired as the Buccaneers' operations manager at a salary of $800 per month. [2] His salary was increased to $1,500 per month on April 15, 1969. With the exception of Mr. Smither, the petitioner was the only stockholder who actively participated in the management and business operations of the Buccaneers. The petitioner found that his duties with the Buccaneers were more challenging and exciting than his career as an insurance agent. He felt that if the *166 Buccaneers could obtain adequate financing, he had the capabilities to do a good job and to make the franchise a success. He frequently told his insurance supervisor that he intended to phase out of the insurance business entirely and devote all his time to the Buccaneers or some other managerial position in basketball. When his income from insurance commissions began to decrease, he received a raise from the Buccaneers to help make up the difference. The petitioner felt that if the Buccaneers became financially successful, he could earn a substantially larger salary. During the period 1970 through 1974, the general salary range for operations managers in the ABA varied from $25,000 to $50,000 per year. The petitioner's salary was lower than the general salary range for operations managers due to the limited budget of the Buccaneers. After being hired as operations manager, the petitioner devoted substantial time and energy in administering the team. His activities ranged from ticket sales to contract negotiations with the players. Since the Buccaneers had a very small administrative staff, the petitioner was involved in every phase of the managerial duties. He normally worked *167 in excess of 40 hours per week for the Buccaneers, and as a result, he was unable to devote as much time to his insurance business, causing his sales volume to decrease. The Buccaneers was never a financial success and constantly lost money. The operating deficits were covered by the proceeds from stock sales and loans. The petitioner made additional stock purchases totaling $30,000 during 1967 and 1968. In 1969, he owned about 11 percent of the Buccaneers stock. Beginning in 1968, the petitioner made loans to the Buccaneers as follows: Date
Amount
January 1968
$ 8,000
March 27, 1968
17,000
May 16, 1968
50,000
June 10, 1968
9,000
July 3, 1968
1,000
July 16, 1968
10,000
December 24, 1968
10,000
January 9, 1969
10,000
These loans, totaling $115,000, were consolidated into a demand note from the Buccaneers bearing 8-percent interest from March 6, 1969. The petitioner later made additional loans to the Buccaneers in the following amounts: Date
Amount
April 29, 1969
$100,000
July 2, 1969
17,500
December 17, 1969
50,000
January 9, 1970
10,000
March 27, 1970
1,500
Each of these loans was evidenced by a promissory note *168 at 8-percent interest. In addition to directly loaning money to the Buccaneers, the petitioner also guaranteed loans which it obtained from others. On September 25, 1968, and November 4, 1968, the petitioner guaranteed loans to the Buccaneers totaling $115,000 from the International City Bank and Trust Company (International). In 1969, the petitioner guaranteed that $7,288.20, advanced to the Buccaneers by two doctors, would be repaid. Finally, on June 5, 1970, the petitioner guaranteed a loan of $125,000 from Media Systems, Inc. (Media Systems), to the Buccaneers. On December 31, 1969, the petitioner sold all of his stock in the Buccaneers for $72.77. Since the stock was "section 1244 stock" within the meaning of section 1244(c), he deducted his loss from the sale of such stock, $34,927.33, as an ordinary loss. During the summer of 1970, the Buccaneers attempted to negotiate the sale of its ABA franchise to at least two prospective purchasers. Finally, on September 15, 1970, the Buccaneers sold such franchise and the contract rights to its players, coach, and administrative assistant to the Memphis Basketball Company (MBC). The petitioner sought employment with MBC *169 after the sale, but he was not offered a job. His salary from the Buccaneers was terminated after the sale. The sales contract provided for periodic payments to the Buccaneers, but MBC almost immediately defaulted. In December 1970, MBC advised the petitioner that it could not meet the current payments required by the sales contract. Since the sale to MBC had come after repeated unsuccessful attempts to sell the ABA franchise and the personnel contracts to other organizations, the default by MBC made it obvious that the petitioner's loans to the Buccaneers, totaling $294,000, had become worthless at that time. In 1971, the petitioner made payments totaling $5,016.57 to two law firms for their services on behalf of the Buccaneers in connection with the sale of the ABA franchise and personnel contracts to MBC. The petitioner was required to make such payments since he had personally guaranteed their payment to the law firms at the time the services were performed. Pursuant to the guarantee given to the two doctors who advanced money to the Buccaneers in 1969, the petitioner paid them $7,288.20 during 1971. He also made payments of $43,867.53 to International and $126,770.84 *170 to Media Systems during such year pursuant to his liability as a guarantor. The petitioner advanced various amounts totaling $3,650.00 to the Buccaneers during the first 4 months of 1971. These amounts were used to pay the Buccaneers operating expenses which included interest on loans guaranteed by the petitioner. The petitioner also paid $1,831.11 to Hibernia National Bank (Hibernia) on behalf of the Buccaneers. During 1971, the petitioner received $3,976.66 as the result of a cash distribution made by a subsequent purchaser of the Buccaneers' ABA franchise and the sum of $60,723.47 as the result of the receipt of a promissory note from Charles Smither. Such note was apparently given to the petitioner due to Mr. Smither's co-liability as a guarantor on the loan from Media Systems. On their joint returns for 1970 and 1971, the petitioners deducted $294,000.00 and $125,861.11, respectively, as business bad debts. In 1971, they filed an Application for Tentative Refund from Carryback of Net Operating Loss for the years 1967 through 1969 based on carrying back a claimed net operating loss to such years. A refund of the taxes for such years was made pursuant to the application. *171 In his notice of deficiency, the Commissioner determined that the petitioners had bad debts of $294,000.00 in 1970 and $107,769.35 in 1971, but in his brief, he conceded that the actual bad debts in 1971 totaled $115,057.55. The other amounts claimed by the petitioner to constitute bad debts were disallowed because they were paid without legal obligation, were a gift, or were unsubstantiated. The Commissioner also determined that all of the bad debts were nonbusiness bad debts. OPINION Section 166(a) allows a taxpayer to deduct any debt which becomes worthless during the taxable year. However, in the case of a taxpayer other than a corporation, section 166(d) (1) provides that the loss resulting from a nonbusiness debt shall be treated as a short-term capital loss. The Commissioner concedes that most of the debts claimed by the petitioner were bona fide debts which became worthless during 1970 and 1971, but contends that they were nonbusiness debts. In order to establish that a debt is a business debt, the petitioner must prove that his dominant motive in loaning funds or guaranteeing loans was proximately related to his own trade or business at the time the loan was given *172 or the guarantee made. Sec. 1. 166-5 (b), Income Tax Regs.; see United States v. Generes,405 U.S. 93 (1972); Robert E. Imel,61 T.C. 318 (1973); Oddee Smith,60 T.C. 316 (1973). The burden of proof is on the petitioner to establish, as a factual matter, the existence of such motive. David Shinefeld,65 T.C. 1092 (1976); J. T. Dorminey,26 T.C. 940, 945 (1956). The petitioner argues that he wished to shift his career from that of being an insurance agent to that of operations manager of the Buccaneers and that his dominant motive for making and guaranteeing the loans was to enable the Buccaneers to continue operating and thereby to protect his new position. The Commissioner contends that the petitioner's dominant motive was to protect his investment or to serve his personal interests. It is well established that a taxpayer may be in the "trade or business" of being an employee. See, e.g., Fischer v. United States,490 F. 2d 218, 221 (7th Cir. 1973); David Shinefeld,supra;James O. Gold,64 T.C. 132, 135 (1975); David J. Primuth,54 T.C. 374, 377 (1970), *173 and the cases cited therein. "[Every] person who works for compensation is engaged in the business of earning his pay * * *." Noland v. Commissioner,269 F. 2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 361 U.S. 885 (1959). The petitioner devoted long hours to his job as operations manager and received a salary at an annual rate of $18,000 during most of the period of his employment. The Commissioner argues that the petitioner's job was not a "trade or business" because the petitioner was an avid sports fan who obviously enjoyed his association with professional basketball. However, it makes no difference whether a man is engaged in a business which gives him pleasure, if it be a business; that is irrelevant * * *. But it does make a difference whether the occupation which gives him pleasure can honestly be said to be carried on for profit. * * * [%thacher v. Lowe,288 F. 994, 995 (S.D. N.Y. 1922). Although the petitioner received substantial investment and trust income, he was not indifferent to the amount of his salary from the Buccaneers. As his responsibilities with the Buccaneers grew, *174 causing his income from the insurance business to decline, his salary from the Buccaneers was increased. Moreover, if the Buccaneers became a financial success, he had reason to hope that his compensation would be increased even more.Since it is undisputed that the petitioner received a substantial salary for his work, it is obvious that the occupation was carried on for profit and that his employment by the Buccaneers clearly constituted a "trade or business." Compare Porter v. Commissioner,437 F. 2d 39 (2d Cir. 1970), affg. per curiam a Memorandum Opinion of this Court; Lamont v. Commissioner,339 F. 2d 377, 380 (2d Cir. 1964), affg. a Memorandum Opinion of this Court; Hirsch v. Commissioner,315 F. 2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Though we are satisfied that the petitioner's employment by the Buccaneers was a trade or business, there remains the factual question of whether his dominant motive for making or guaranteeing the loans was to protect such trade or business. We are dealing with a series of transactions, and the circumstances surrounding each of them must be examined to ascertain *175 what was the petitioner's dominant motive when the transaction occurred. Two of the loans, totaling $25,000, were made before the petitioner became an employee of the Buccaneers, and there is no basis for concluding that such loans were made to protect an employment which did not then even exist. Until he was actually hired, there was no evidence that he would receive any compensation for his services to the Buccaneers. Consequently, his duties as an unpaid, unofficial operations manager did not constitute a trade or business since he had no bona fide expectation of realizing a profit. See Hirsch v. Commissioner,supra; Thacherv. Lowe,288 F. at 995; cf. Lamont v. Commissioner,supra; White v. Commissioner,227 F. 2d 779 (6th Cir. 1955), affg. per curiam 23 T.C. 90 (1954), cert. denied 351 U.S. 939 (1956); Margit Sigray Bessenyey,45 T.C. 261 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Since the petitioner does not argue that such loans were proximately related to any other trade or business, the *176 debt resulting from such loans was a nonbusiness debt. We are convinced that the petitioner's dominant motive for making and guaranteeing some of the loans after he was hired as the operations manager was to protect that employment. He was an avid sports fan who obviously enjoyed his job and was confident of his ability to perform his duties. Though he had been successful in the insurance business, his interest in that business waned, once he was hired by the Buccaneers. He planned to gradually end his insurance career and devote all his efforts to his new career. When it became obvious to him that the Buccaneers needed additional funds to continue in business, he loaned or guaranteed funds to keep them going. While it is true that the Buccaneers did not require him to make these loans and guarantees as an express condition for keeping his job, it is clear that such loans and guarantees were made to keep the Buccaneers in business in order to further the petitioner's own career in professional sports. Because of his substantial personal resources, the petitioner was able and willing to assume greater financial obligations to keep the Buccaneers going than could the average employee. *177 Yet, from the time the petitioner was hired as the operations manager of the Buccaneers until the team was sold in 1970, he made loans of $269,000.00 to the Buccaneers and guaranteed loans to it in the amount of $247,288.20. We are not convinced that his dominant motive for making all of such loans and guarantees was to protect his employment. Despite his interest in the position, it is unreasonable to believe that his dominant motive for taking on financial obligations of such magnitude was to protect such position. United States v. Generes,405 U.S. 93 (1972). It appears more likely that after having assumed some of such obligations, he then felt compelled to make additional loans or guarantees in order to protect his hope of repayment of the loans already made. See Oddee Smith,60 T.C. 316 (1973). There is no event indicating when the petitioner's motive changed so that we must exercise our best judgment in fixing the date of the change. See Sidney Merians,60 T.C. 187 (1973). On April 29, 1969, he loaned an additional $100,000.00, resulting in total loans of $215,000.00 to the Buccaneers at that time, and guaranteed loans *178 to the Buccaneers totaling $115,000.00, and it is difficult for us to believe that any additional amounts would have been loaned for the dominant reason for protecting his employment. Accordingly, we find that $190,000.00 of the loans and the guarantees to International were made for the dominant purpose of protecting such employment and are to be treated as business bad debts. See Tony Martin,25 T.C. 94 (1955); cf. Trent v. Commissioner,291 F. 2d 669 (2d Cir. 1961), revg. 34 T.C. 910 (1960). Because it appears unreasonable to conclude that the petitioner would have assumed any additional obligations to protect his employment, we also hold that when he made or guaranteed loans after April of 1969, his dominant motive was not to protect his employment. At some time in 1969, the petitioner guaranteed a loan of $7,288.20 to the Buccaneers made by two doctors. Since the record does not indicate when the loan was made in 1969, we conclude that it occurred after April of that year and must therefore be treated as a nonbusiness bad debt. The attempts to sell the Buccaneers after the completion of the 1969-1970 season furnish another *179 indication that the loans made or guaranteed by the petitioner after such time should not be treated as business loans. In 1970, numerous attempts were made to sell the team, and the petitioner must have been aware that a sale of the team would likely result in the loss of his position. Thus, we cannot accept that his dominant motive was to protect his position when he made or guaranteed loans knowing that the team was likely to be sold. We have rejected the Commissioner's argument that the petitioner's dominant purpose was to protect his equity investment. The record clearly indicates that such investment was not the dominant motive for his loans and guarantees. His investment in the Buccaneers never exceeded $35,000, and he was only an 11-percent shareholder. Since his stock was "section 1244 stock," the potential loss on his investment was substantially offset by the tax benefit of deducting any loss on the stock from ordinary income. Furthermore, in 1969, he sold all of his stock and owned no equity interest, yet he continued to make loans to the Buccaneers. In connection with the sale of the ABA franchise, the petitioner guaranteed the payment of the Buccaneers' attorneys *180 fees. In 1971, he was required to pay $5,016.57 as a result of such guarantee. The Commissioner contends that the petitioner has not established that he was legally required to make such payments so that he was a mere volunteer. See Ralph E. Wilson,40 T.C. 543 (1963). However, the petitioner testified that he had been required to guarantee such fees at the time of the sale, and we find such testimony to be credible. It seems unlikely that the law firms involved would have provided the necessary legal services for the Buccaneers without some definite commitment from a financially solvent individual to pay their fees. Consequently, we agree with the petitioner that the payment of the legal fees in 1971 created a bad debt, but in view of our conclusions as to the motives at the time of the guarantee, such debt is a nonbusiness debt. During 1971, the petitioner paid $1,831.11 to Hibernia for interest on a loan to the Buccaneers which he guaranteed. The Commissioner concedes in his brief that such payment resulted in a bad debt, but contends that such debt is a nonbusiness debt. Since the petitioner failed to provide any evidence concerning the reasons that he *181 guaranteed the loan from Hibernia or when such guarantee was given, the Commissioner's determination must be sustained. Finally, the petitioner argues that certain sums that he advanced to the Buccaneers in 1971 to pay its operating expenses resulted in bad debts. However, when the funds were advanced, the petitioner admits that there was little chance that he would be repaid. At that time, the Buccaneers had many debts, no assets, and little chance of receiving future payments from MBC. In view of these circumstances, the debts were worthless when the petitioner acquired it, and no bad debt deduction is allowable. Eckert v. Burnet,283 U.S. 140 (1931); see George B. Markle, Jr.,17 T.C. 1593, 1598-1599 (1952); Fred A. Bihlmaier,17 T.C. 620, 626 (1951); Walter J. Runyon,8 T.C. 350, 356 (1947). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue↩
2. The evidence presented at the trial of this case clearly established that the petitioner was employed as the Buccaneers' operations manager on May 1, 1968. We reach this conclusion without deciding whether we should take judicial notice of the evidence filed by the petitioner in his reply brief.↩