CARL D. HUGHES, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hughes v. Commissioner
Docket No. 11686-79.
United States Tax Court
T.C. Memo 1981-140; 1981 Tax Ct. Memo LEXIS 607; 41 T.C.M. (CCH) 1153; T.C.M. (RIA) 81140; March 25, 1981. Carl D. Hughes, Jr., pro se. F. Michael Kovach, Jr., for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's 1976 Federal income tax in the amount of $ 804.74. After concessions, the remaining issues are whether petitioner is entitled to: (1) a casualty loss deduction under section 165(c)(3); [1] (2) a deduction for traveling expenses under section 162(a)(2); (3) a home office deduction under section 280A; and (4) a deduction for automobile expenses under section 162(a) in an amount greater than that allowed by respondent. [2] The issues are principally questions of substantiation. Although the amount of money involved is quite small, petitioner, who is now attending law school, pursued each issue vigorously and in detail during a trial lasting some five hours. *610 FINDINGS OF FACT Some of the facts have been stipulated and are so found. Carl D. Hughes, Jr. (hereinafter petitioner) resided in Detroit, Michigan at the time of filing the petition in this case. During the latter part of 1974, petitioner was employed as a consulting engineer for a firm in Atlanta, Georgia. On October 21, 1974, petitioner formed Hughes Enterprises, Inc. (HEI), a Delaware corporation, organized to operate as an international marketing and development firm. Petitioner had hoped to develop this enterprise in the field of engineering and export management in the future and to tap the growing mail order market through HEI's principal operating division, Universal Creations, Limited (UCL). Casualty Loss
Petitioner decided to move to Detroit, Michigan to establish HEI's corporate headquarters there. He resigned from his engineering job and hired Allied Van Lines (Allied) to ship his household goods to Detroit. When the goods were picked up on December 19, 1974, an inventory sheet describing the various cartons was filled out and signed "at origin" by petitioner and a representative of Allied. Copies of this inventory sheet were retained by each party. *611 The household goods were supposed to arrive in Detroit by December 27, 1974, but did not arrive until January 5, 1975. When the goods arrived, petitioner inspected the shipment for damaged or missing items. He and the truck driver signed "at destination" on Allied's copy of the inventory sheet, and the only item noted as damaged or missing was one broom. However, petitioner apparently did at that time give notice that inventory item 10 was missing or damaged. Thereafter, petitioner made a full inspection of his goods and alleges that he discovered that another box was missing and that the contents of yet another were damaged. [3]
Based upon a personal property inventory that he maintained, petitioner estimated the value of the items claimed to be lost or damaged. [4] On January 20, 1975, he filed a loss and damage claim with Allied *612 in the amount of $ 523.87. Thereafter on February 7, 1975, petitioner filed a delay claim in the amount of $ 173.75. The delay claim represented the cost for meals during the delayed arrival of petitioner's goods and the loss of a guaranteed hotel reservation in Las Vegas which petitioner had forfeited while waiting for his household goods. The record is silent as to what occurred from this point onward until September 4, 1975, when petitioner had a telephone conversation with a claims adjustor of Allied. At that time petitioner was informed that, except for inventory item 10 and the broom, his claim was being rejected for not being timely made. Allied agreed to pay damages for the two items reported *613 to the driver and for a portion of petitioner's meal expenses during the delay period. Petitioner received a letter dated September 9, 1975, along with Allied's check in the amount of $ 114.17. The letter confirmed the earlier telephone conversation and stated that the check was "for full and final settlement of your claim." Petitioner wrote "REFUSED" on the check and returned it uncashed to Allied. Petitioner contacted an attorney to pursue his claim. Petitioner's attorney wrote two letters to Allied and three letters to the Interstate Commerce Commission in connection with the claim. Apparently, Allied's offer of September 9, 1975 was its final offer, and the record shows no change in Allied's position after that date. On November 5, 1975, petitioner's attorney submitted a "Statement for Legal Services Rendered" to petitioner which indicated "Total Billing" in the amount of $ 119.50, less a credit for a retainer of $ 90, and fees due and owing of $ 29.50. The record does not show whether, and, if so, when this $ 29.50 was paid. The record does not show that the attorney took any further actions after sending the November 5, 1975 billing. Petitioner testified that in early *614 1976 his attorney advised him that legal fees would exceed probable recovery and that based on that advice petitioner at that time dropped his claim. [5] The Court did not believe that testimony. On his 1976 Federal income tax return, petitioner claimed a casualty loss deduction in the amount of $ 824. Petitioner testified that the deduction included the property loss claim of $ 523.87, the delay claim of $ 173.75, the attorney's fees of $ 119.50, and another $ 6.88 that he thought might be an additional legal fee. However, in his response to respondent's interrogatories, petitioner had stated under oath that some $ 127 of that $ 824 related to another casualty loss involving an automobile. Respondent disallowed the entire amount. Traveling Expense
In 1976 *615 petitioner was a full-time salaried managing engineer with Michigan Bell Telephone, and was a part-time unpaid employee of HEI. HEI was an electing small business corporation during the year in issue. Petitioner held 59.6 percent of the outstanding stock and was the president and chief executive officer. His father, the Rev. Carl D. Hughes, Sr., held 10.5 percent of the outstanding stock and was the secretary-treasurer. Neither petitioner nor his father received any compensation for their services. HEI's Form 1120S, U.S. Small Business Corporation Income Tax Return, for the year 1976 reported a net loss of $ 3,653 for the year, of which petitioner claimed $ 2,177 as his allocable share. In addition petitioner deducted as employee business expense in connection with his unpaid position with HEI an amount of $ 2,457. HEI's gross receipts in 1976 were $ 926. [6]
*616 As the president of HEI, petitioner ran the corporation with some assistance from his father. Petitioner had the sole discretion to determine what expenses the corporation should incur and whether or not the expenses he incurred on behalf of the corporation should be reimbursed. Throughout this period of time, when HEI did not have the funds to pay a certain expense, petitioner paid it and deducted the item on his tax return as employee business expense. He considered these payments to be loans to HEI. One such expense was air fare for petitioner's trip to California in early 1977. The business of UCL, the principal and at that time only operating division of HEI, was marketing photographic novelty products and other novelty products through the U.S. mails. Some of these items included photo pillows, posters, calendars and puzzles. UCL advertised in major magazines and newspapers to solicit orders and any orders were sent in to a mail drop in Birmingham, Michigan. The merchandise was then manufactured in Florida and the manufacturer "drop shipped" the item directly to the customer, with a UCL label attached as if the item came from UCL in Birmingham, Michigan. During *617 the latter part of 1976, petitioner planned a trip to Los Angeles to meet with the agents of Farrah Fawcett-Majors, a television and movie star. One of the purposes of this trip was to obtain the rights to use her picture on posters and pillows sold by UCL. Although the trip was scheduled for early 1977, petitioner purchased and charged his ticket costing $ 336 to his Diner's Club credit card on December 20, 1976. [7] Petitioner was not reimbursed by HEI for this expense. The trip took place in early 1977 and while in Los Angeles, petitioner did, among other things, meet with the agents as planned and obtained permission to do a limited marketing survey utilizing Farrah Fawcett-Major's picture. [8]
*618 On his income tax return for 1976, petitioner deducted $ 390, plus an additional $ 67, for the 1977 trip. Respondent disallowed the entire amount. The only expense actually incurred in 1976 was the $ 336 plane fare. Home Office
During the year in issue, HEI listed its office address as 15670 West 10 Mile Road, Southfield, Michigan. The Southfield, Michigan address was the address of a secretarial and answering service that petitioner had hired to receive HEI's mail and answer any phone calls. This "mail drop" address was used for HEI's business in connection with corporate mailings, advertisements, and HEI's income tax return. UCL, HEI's only operating division, operated in the same manner, but it used the address of a different secretarial and answering service at 700 East Maple Avenue, Birmingham, Michigan, for its advertisements and other mailings and for telephone calls. Neither HEI nor UCL had any office space. Petitioner operated HEI and UCL entirely from his home. During the first five months of 1976, petitioner lived with his father. The record does not establish that he paid any rent to his father. In late May of 1976, petitioner moved into *619 a studio apartment in the Diplomat Towers Apartments in Southfield, Michigan. The studio apartment was essentially one large room, plus a kitchenette, a walk-in closet, and bathroom. One had to walk through the walk-in closet to get to the bathroom. Petitioner utilized the large walk-in closet as a home office. He used this area to store various corporate books and records of HEI and to do work related to HEI. The only personal activity for which petitioner used this area was walking through the closet to go to and from the bathroom. Petitioner estimated the size of the walk-in closet as 20 percent of the total floor space of the apartment. For the seven months petitioner lived there in 1976, he paid rent, including utilities, of $ 240 a month for three months and $ 250 a month for four months for a total of $ 1,720. Petitioner also used the telephone in his apartment on a regular basis for HEI, but used a company credit card for all long distance calls. His monthly base fee for the telephone was approximately $ 7 per month, for a total of about $ 49 for the seven months. On his 1976 income tax return, petitioner deducted $ 623 as a home office expense, which he asserts *620 is based upon 20 percent of his rent and telephone expense. [9] Respondent disallowed the entire amount. Automobile Expense
In his position as president and chief executive officer of HEI, petitioner claims to have made numerous trips on behalf of HEI. These trips were generally made to the post office, to the mail drops for HEI and UCL, to the bank, or to the HEI computer service. These trips were usually made en route to or from petitioner's job at Michigan Bell but sometimes from his apartment. The distances between these various points were rather short. [10]
*621 On his tax return for 1976, petitioner claimed 20,000 miles of travel, of which he claimed 13,000 as business mileage for HEI. Petitioner maintained a "Daytimer" daily log, which showed in abbreviated form his various personal and business appointments and errands each day. Although the daily log is quite detailed in some respects, it does not contain any mileage figures or odometer readings for any of these appointments or errands. On his 1976 income tax return, petitioner multiplied this 13,000 mileage figure by the mileage allowance for 1976 and added $ 50 for parking and tolls, to arrive at a deduction of $ 2,000. Respondent has allowed $ 300 as an ordinary and necessary business expense, $ 275 of which was for mileage and $ 25 for parking and tolls. OPINION Casualty Loss
Section 165(c)(3) allows a deduction for the uncompensated loss of nonbusiness property arising from "fire, storm, shipwreck, or other casualty, or from theft." [11] The term "other casualty" means something similar to a fire, storm, or shipwreck in requiring a sudden, unusual, unexpected and accidental *622 force or agency to be applied against the property. To prevail here, petitioner must first prove that he suffered a casualty loss in 1975 as he claims, and second, that the loss did not occur for purposes of the deduction until 1976, because he had a reasonable prospect of recovering from Allied Van Lines up until the early part of 1976. Petitioner of course has the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
*623 On the record in this case, we think there is serious doubt as to whether or not petitioner suffered any loss in excess of the amount Allied offered to pay. Some portion of the amount offered was for the delay claim. Section 165(c)(3) limits a casualty loss deduction to losses of property, so petitioner's delay claim would not be deductible in any event. But even if the Court assumes petitioner suffered a loss of property, we conclude that any such loss would have been deductible in 1975 rather than 1976. The regulations provide that a casualty loss is deductible in the year the casualty occurred, unless there is a "reasonable prospect of recovery" and then the loss is treated as sustained when "it can be ascertained with reasonable certainty whether or not such reimbursement will be received." Sec. 1.165-1(d), Income Tax Regs.[12]
*624 Petitioner argues that he had a reasonable prospect of recovery until early 1976 when his attorney allegedly told him that the expense of litigation would exceed the amount involved. Petitioner says it was at that time that he abandoned his claim and suffered the casualty loss. In Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811-812 (1974), this Court stated: A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. * * * The standard for making this determination is an objective one, under which this Court must determine what was a "reasonable expectation" as of the close of the taxable year for which the deduction is claimed. * * * The situation is not to be viewed through the eyes of the "incorrigible optimist," and hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction. * * * The standard is to be applied by foresight, and hence, *625 we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year. Nor does the fact of a future settlement or favorable judicial action on the claim control our determination, if we find that as of the close of the particular year, no reasonable prospect of recovery existed. * * * (Citations omitted.) Under the foregoing principles, we cannot find, as petitioner argues, that his prospects of recovery extended into 1976. Allied took a firm stand in September of 1975, a stand that it evidently did not thereafter change. Only by looking through the eyes of an "incorrigible optimist" could a prospect for recovery be said to exist. As for petitioner's testimony that he did not realize until early 1976 that the expenses of litigation would exceed the amount involved, the Court finds that testimony inherently incredible. The bill from his attorney for writing five letters should have alerted him to that fact. In any event, the Court is not persuaded that petitioner took any further action at all after the attorney sent him the bill on November 5, 1975, and if the claim was abandoned, it was abandoned *626 then and not in early 1976. [13] Accordingly, if there was a loss, it was sustained in 1975 and we conclude that any reasonable prospects for recovery petitioner may have had ended before the end of that year. A casualty loss deduction is therefore denied for 1976. Travel Expense
Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred in a trade or business, including traveling expenses while away from home in the pursuit of a trade or business. Section 162(a)(2). Petitioner has claimed employee business expenses of some $ 2,307 in connection with his unpaid position as president and chief executive officer of HEI. One of the items claimed is a trip to California in early 1977. None of the *627 expenditures for this trip are deductible in 1976, the year involved here, except possibly the cost of the plane ticket which was purchased in late 1976. See footnote 8 above. However, in the matter of claimed employee business expenses, petitioner consistently fails to draw any distinction between himself as an employee of the corporation and himself as an investor or between himself and his corporation. Petitioner contends that since he is the principal shareholder, president and chief executive officer of HEI, it does not matter whether he claims an expense as an employee of HEI or as a shareholder protecting his investment. We disagree. It is well established that the business of a corporation is not the business of its officers and shareholders. Burnet v. Clark, 287 U.S. 410 (1932); Deputy v. DuPont, 308 U.S. 488 (1940); Whipple v. Commissioner, 373 U.S. 193 (1963); United States v. Generes, 405 U.S. 93 (1972). As the Supreme Court succinctly stated the rule in the Whipple case, "[d]evoting one's time *628 and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." 373 U.S. at 202. In a proper factual situation, a shareholder can be found to be engaged in a separate trade or business of working as a corporate executive or corporate manager for a salary. United States v. Generes, supra; Trent v. Commissioner, 291 F. 2d 669 (2d Cir. 1961). Petitioner paid for his travel expenses himself because HEI did not have the funds to do so. For the same reason apparently, petitioner did not seek reimbursement from HEI.These travel expenses are the expenses of the corporation.A shareholder, even a majority or sole shareholder, is not entitled to a deduction from his personal income tax for payment of expenses of his corporation, such amounts constituting either a loan or a contribution to capital, which are deductible, if at all, only by the corporation. Deputy v. DuPont, supra; Rink v. Commissioner, 51 T.C. 746, 751 (1969). While there may *629 be an exception where a shareholder incurs an expense to protect or maintain his own separate trade or business of being a corporate executive, that can hardly be the dominant motivation here. United States v. Generes, supra; Fischer v. United States, 490 F. 2d 218, 221 (7th Cir. 1973); Walliser v. Commissioner, 72 T.C. 433, 437 (1979). Since petitioner was an unpaid employee, we conclude that he incurred these expenses not to protect his job but to protect his investment. Where payments are made to protect or enhance the value of a person's stock in the corporation, such payments are capital contributions. Koree v. Commissioner, 40 T.C. 961 (1963). We hold that petitioner is not entitled to a deduction for traveling expenses under section 162(a)(2). Home Office Deduction
The Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, changed the law with respect to an office in the home.Section 601(a) of that act added a new section 280A to the Code which strictly limited the deductions for expenses of an *630 office in the home, effective for taxable years beginning after December 31, 1975. 90 Stat. 1569-1572. Section 280A(a) provides that no deduction (otherwise allowable) shall be allowed "with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." To this general rule of non-deductibility, section 280A(c)(1) carves out certain exceptions. Section 280A(c)(1) provides that the general rule of non-deductibility shall not apply to-- any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis-- (A) as the taxpayer's principal place of business, (b) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, * * * In the case of an employee, those exceptions apply "only if the exclusive use * * * is for the convenience of his employer." Section 280A(c)(1). For a deduction to be allowable under section 280A(c)(1), the activity for which the office in the home is used must *631 constitute a trade or business as opposed to merely an income-producing activity under section 212. Curphey v. Commissioner,73 T.C. 766, 770-775 (1980), on appeal (9th Cir. Nov. 24, 1980). Petitioner's trade or business during 1976 was that of being an engineering manager for Michigan Bell Telephone Company. However, the Curphey case shows us that a taxpayer may have two trades or businesses or be engaged in a profession and a business at the same time, and that the office in the home may be the "principal place of business" of that second trade or business. The issue is one of fact and the test is whether the taxpayer's activities are sufficiently systematic and continuous as to place him in a second trade or business which has as its principal place of business the office in the home. 73 T.C. at 775. Respondent has not suggested that petitioner was not carrying on a trade or business as a corporate executive of HEI. On the facts of this case, we conclude that petitioner used the walk-in closet of his studio apartment exclusively and on a regular basis for the activities of HEI, and that the use was for the convenience of HEI. Petitioner's *632 incidental use of the closet to walk to and from his bathroom was deminimis. As HEI had no other corporate office or place of business, other than the mail drops which cannot be considered to be an office, we further find petitioner's apartment to be the principal place of business of HEI. However, that does not end our inquiry.
Section 280A(c)(5) places a limit on a home office deduction not to exceed "the gross income derived from such use." [14] Petitioner was not compensated by HEI and derived no gross income from HEI either as an employee or a shareholder. [15] Therefore, a home office deduction cannot be allowed. Gestrich v. Commissioner,74 T.C. 525, 530 (1980). *633 Quite apart from the section 280A, petitioner claimed a deduction for business use of the telephone. Petitioner allocated 20 percent of his apartment floor space to his home office, and applied that percentage to both rent and telephone expense. The floor space allocation is meaningless for determining any percentage of business usage for the telephone. There is no evidence as to business usage for the telephone. Accordingly, a deduction is denied. Automobile Expense
Section 162(a) allows a deduction for local transportation expenses incurred by a taxpayer in his trade or business. Petitioner claims automobile mileage expense in connection with his activities for HEI. The law is well settled that a taxpayer's expense of traveling between his home and his place of employment (commuting expense) is a personal nondeductible expense under section 262. Fausner v. Commissioner, 413 U.S. 838, 839 (1973), rehearing denied, 414 U.S. 882 (1973); Commissioner v. Flowers, 326 U.S. 465 (1946); *634 rehearing denied, 326 U.S. 812 (1946). However, the expenses incurred for local travel between one place of business and another place of business are deductible. Heuer v. Commissioner, 32 T.C. 947 (1959), affd. per curiam 283 F. 2d 865 (5th Cir. 1960); Steinhort v. Commissioner, 335 F. 2d 496 (5th Cir. 1964). That is true even where the second place of business is located in the taxpayer's home, as here. Curphey v. Commissioner, supra, at 777-778. And respondent has not suggested otherwise, having allowed petitioner $ 275 for local transportation and another $ 25 for parking and tolls. [16] The only issue here is whether or not petitioner has established that he is entitled to a greater amount. We conclude that he has not. Petitioner testified that when he made out his tax return for 1976, he went through *635 his Daytimer log page by page, estimated from memory the mileage between points, and actually "sat there with a calculator and pecked the numbers in" for each trip to arrive at this figure of 13,000 business miles. The Court found that testimony inherently incredible. The Court concludes that the 13,000 figure was just an estimate and an inflated one. Considering the short point to point distances involved, it would have been virtually impossible for petitioner to have traveled that many business miles. See footnote 10. Although petitioner objected strenuously at the trial to the method used by respondent to determine the amount of business mileage allowable, petitioner has not furnished the Court with any better method. See footnote 10. On the record in this case, the Court has no basis for allowing any greater amount than respondent has already allowed. Respondent's determination must be sustained. Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated. ↩
2. During the trial petitioner conceded an educational expense deduction for a professional engineer's review course.↩
3. Petitioner at some point noted these items on his retained copy of the inventory sheet, a copy bearing neither the "at destination" signatures nor the exception in regard to the broom. At the trial petitioner testified that he had notified the truck driver of the additional missing or damaged items. The Court did not believe this testimony.↩
4. There is a serious question as to whether or not that personal property inventory was a contemporaneously maintained record. In addition to entries in the book for items of property acquired in 1977, 1978, 1979 and 1980, the order in which the acquisition dates are listed shows that the entries were not entered chronologically after petitioner allegedly began maintaining that book in February of 1974. Petitioner testified that this record "was revised and messed with."↩
5. Petitioner also testified that he did not recover the $ 114.17 originally offered by Allied, intimating that by early 1976 Allied was refusing to talk to him or to return his telephone calls. Petitioner's Daytimer log shows that a case of Hughes vs. Allstate and Allied was filed in the local Court of Common Pleas on December 30, 1976. That suit may or may not relate to this item or to this casualty loss.↩
6. On his individual income tax return, petitioner has deducted some $ 4,634, plus $ 623 for home office expense, in connection with HEI, a small business corporation with gross receipts of only $ 926 and total income of only $ 595. While petitioner described the business as being in "an infantile growth stage" and as a "conception of Carl D. Hughes, Jr. [that] was being born and separated from Carl D. Hughes, Jr.", it appears to the Court that in 1976 the business was hardly more than a gleam in petitioner's eye. However, respondent has not raised any question as to the ordinary and necessary nature of the expenditures or the bona fides of the whole transaction, so the Court will confine itself to the matter of substantiation of the various items.↩
7. During the trial, petitioner could not recall how he paid for this ticket. After examining the ticket and comparing it to several Diner's Club charge receipts submitted by petitioner, we find the method of payment to be by Diner's Club charge. ↩
8. This trip was petitioner's second trip to Los Angeles during 1976 - 1977. During both trips, petitioner stayed with his sister. Respondent argues that both of these trips were strictly personal in nature. However, based upon petitioner's testimony and documents submitted, we find some business reason for this 1977 trip, but the only item deductible in 1976 would be the plane fare, the other expenditures not being incurred until 1977.↩
9. According to the Court's calculation, 20 percent of petitioner's rent and phone expense ($ 1,769) for the seven-month period would amount to $ 353.80.↩
10. Just prior to trial, petitioner took odometer readings of the various point to point distances he traveled on business during 1976, and testified as to what these distances were. Petitioner testified his apartment was 2.4 miles from Michigan Bell Telephone, 5.4 miles from the National Bank of Southfield (UCL's bank), 5.3 miles from the Southfield Post Office and 1.1 mile from HEI's mail drop. He further testified that the distance from Michigan Bell Telephone to UCL's mail drop was 6.6 miles and the distance from the National Bank of Southfield to the Post Office was.1 mile. He suggested that a careful examination of his Daytimer log would show which trips were business related. The Court requested petitioner to summarize in his brief the trips he claims as business trips and the mileage involved. Petitioner chose not to file a brief on the merits, but simply reargued his pretrial motions for discovery and a continuance of the trial, motions denied by the Court before the trial began. Therefore, petitioner has not furnished the requested summary, and the Court does not find the Daytimer entries to be self-explanatory or even comprehensible for purposes of determining the number of business miles traveled in 1976.↩
11. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $ 100. For purposes of the $ 100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
12. SEC. 1.165-1(d), Income Tax Regs.
(d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * * (2) (i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim by an adjudication of the claim, or by an abandonment of the claim. * * * (ii) If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. * * *↩
13. As to the suit petitioner instituted against Allstate and Allied on December 30, 1976, if that suit pertained to all or any part of the casualty loss involved here, then it would appear that there was some prospect for recovery but that it extended beyond 1976 and would still not be deductible in the year before the Court. See footnote 5 above.↩
14. Sec. 280A(c)(5) provides as follows: (5) LIMITATION ON DEDUCTIONS.--In the case of a use described in paragraph (1), (2), or (4), and in the case of a use described in paragraph (3) where the dwelling unit is used by the taxpayer during the taxable year as a residence, the deductions allowed under this chapter for the taxable year by reason of being attributed to such use shall not exceed the excess of-- (A) the gross income derived from such use for the taxable year, over (b) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used. ↩
15. HEI itself had a loss of $ 3,653 for the year, of which petitioner's share was $ 2,177. Although HEI had gross income of $ 926 for the year, HEI did not pay any rental expense and we cannot look to HEI's gross income to circumvent the limitation of section 280A(c)(5)↩. Even if petitioner could be deemed to have paid a portion of his apartment rent on behalf of HEI, that would be just another loan or contribution to capital of the corporation and would not entitle petitioner to a deduction for an office in the home.
16. Since we dispose of this issue on the basis of lack of substantiation, we need not consider whether the local transportation involved here, much of it occurring on petitioner's way to and from his job with Michigan Bell, differs from the travel we allowed in the Curphey↩ case.