INVESTORS INSURANCE AGENCY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4457–78.     Filed September 10, 1979.

*F. A. LeSourd, Meade Emory,* and *Rodney J. Waldbaum,* for the petitioner.

*Thomas N. Tomashek,* for the respondent.

## OPINION

NIMS, *Judge:* Respondent has determined an income tax deficiency of $29,434 for the calendar year 1974. The sole issue for determination is whether the sum of $130,000 received by petitioner during 1974 constitutes "interest," thereby subjecting petitioner to the personal holding company tax under section 541.[1]

The facts in this case were fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference.

The petitioner maintained its principal office in Seattle, Wash., at the time the petition in this case was filed. The corporate tax return for the period herein involved was filed with the Office of the Internal Revenue Service at Ogden, Utah.

The facts necessary to an understanding of the case follow.

On October 11, 1963, petitioner (Investors) and Sherwood Development Co., a Washington corporation (Sherwood), entered into a joint venture agreement for the purpose of acquiring, developing, and selling the Twin Lakes Properties. Investors agreed to provide up to $350,000 for the acquisition and development of the property, with the understanding that

---

[1]All references to Code sections are to sections of the Internal Revenue Code of 1954, unless otherwise stated.

Sherwood would obtain as much of the funds necessary for such development as was possible from land development loans. Any sums required for the purchase and development of the property over and above $350,000 were to be provided by the parties equally. The agreement provided for 6-percent interest on amounts advanced by Investors and Sherwood and such interest was to be calculated monthly on outstanding balances as of the end of each month. Interest was to accrue until such time as the operating committee of the joint venture (composed of four individuals, two each being appointed by each of the two joint venturers) decided to distribute funds. When such funds were distributed, each joint venturer was to receive an amount equal to 6 percent per annum on the outstanding balances of any funds advanced to the joint venture, and in addition, Sherwood was to be paid $50 for each residential lot sold. Capital advanced by the joint venturers was to be returned in full prior to the payment of any interest thereon. Available amounts in excess of the amounts that were required to be distributed to Investors and Sherwood were to be divided equally. The joint venture agreement provided for termination of the joint venture on December 31, 1968, unless extended by the joint venturers.

Prior to December 30, 1968, Sherwood changed its name to the Quadrant Corp., and for convenience is hereinafter called Sherwood-Quadrant. On December 30, 1968, Investors and Sherwood-Quadrant entered into an agreement extending the duration of the joint venture agreement to December 31, 1973, and provided for additional land to be developed by the joint venture.

On November 5, 1969, Dick Willard and Ruby Willard, his wife, and George E. Bell and Florence Bell, his wife, as "Guarantors," and Investors entered into a guaranty agreement which recited, among other things, that the Guarantors were the owners of all of the outstanding stock of Sherwood-Quadrant; that Sherwood-Quadrant and Investors had theretofore entered into the joint venture agreement, as amended; that as of the date of the guaranty agreement, Investors had invested $350,000 in the joint venture in excess of the investment by Sherwood-Quadrant; that the Guarantors were in the process of entering into agreements with Weyerhaeuser Co. for the exchange of all of the stock of Sherwood-Quadrant for a certain number of shares of Weyerhaeuser stock; that paragraph 13 of the joint

venture agreement required the consent of Investors to such transfer of the Sherwood-Quadrant stock and a provision of the proposed "Weyerhaeuser-Quadrant acquisition agreement and plan of reorganization" (Weyerhaeuser-Quadrant agreement) required that Investors consent to the transfer of the Sherwood-Quadrant stock; that another provision of the Weyerhaeuser-Quadrant agreement required that Investors release certain of its rights under the joint venture agreement and that Investors would be willing to grant its consent and release certain of its rights under the joint venture agreement on terms and conditions spelled out in the guaranty agreement.

The Guarantors jointly and severally guaranteed that the $350,000 advanced by Investors, plus interest thereon at the rate of 6 percent per annum, would be paid to Investors from the cash flow developed from the operation of the joint venture, and if not so paid by the time the joint venture was terminated and in no event later than December 31, 1973, the Guarantors would make such payment. The guaranty agreement further provided that "the obligation of Guarantors under this Agreement is direct and primary, and joint and several, and is not limited to that of sureties, guarantors or indemnitors."

By a series of extension agreements between Investors and Sherwood-Quadrant, the joint venture agreement was extended to May 31, 1974, at which time the joint venture was to terminate unless its duration was again extended by the parties thereto.

On December 30, 1974, Investors entered into yet another agreement with the Guarantors, the "Amendment to Guaranty Agreement," reciting that the money guaranteed had not been paid to Investors; that the Guarantors and Investors wished to arrange for the payment of interest as required by the "Guaranty" and to provide for further extension of the guaranty and to correct the principal amount set forth in the guaranty. The amendment to guaranty agreement also provided that its provisions were contingent upon Investors and Sherwood-Quadrant executing a certain amendment to the joint venture agreement which provided, in part, that the joint venture would again be extended, this time to December 31, 1978.

Guarantors and Investors agreed that as of December 31, 1974, there would be owing the sum of $230,030.23 of interest computed to that date under the terms of the guaranty

agreement and that Guarantors would make a payment on this interest in the amount of $130,000 as of December 30, 1974, and would pay the balance of the interest, $100,030.23, on January 2, 1975. The Guarantors also agreed to continue to pay interest to Investors at the rate of 6 percent per annum on $348,683 of principal (which was an agreed-upon adjusted principal amount), or on such amount to which Investors' investment in the joint venture might from time to time be reduced, until December 31, 1978, at which time the then-outstanding balance of the guaranteed sum, together with interest thereon, would be due and payable in full. It was further provided that if Investors in the future received sufficient distributions from the joint venture to repay its entire cash investment, then in that event Investors would reimburse the Guarantors for their expense to the extent of such excess.

As required by the foregoing amendment to the guaranty agreement, Investors and Sherwood-Quadrant made further conforming amendments to the joint venture agreement.

On December 31, 1974, Investors received checks from Dick Willard in the sum of $65,000; from George E. Bell in the sum of $32,500; and from Florence Van Aken in the sum of $32,500, totaling the $130,000 in question. This amount was included in the $131,236 reported as interest by Investors on its corporate tax return for 1974.

The parties agree that Investors is liable for personal holding company tax if the Court finds the $130,000 received by Investors on December 31, 1974, to have been interest.

Investors' position is, simply stated, that any joint-venture distribution would have been received by Investors in its capacity as a joint venturer and not as "one who is not a partner." Sec. 707(a). Investors also urges that the $130,000 was not received by it as a guaranteed payment under section 707(c). Therefore, argues Investors, any money received from the Guarantors took the same character in the hands of Investors as it would have had if received directly from the joint venture; i.e., it would have been a distribution, not interest on an indebtedness.

Respondent's position is that the $130,000 has all of the indicia of interest under section 61, it was reported as such by Investors on its corporate tax return, and therefore it constitutes interest under section 543(a)(1).

In order to determine the application of the tax law to the amount in question, we must ascertain the legal relationship between the Guarantors and Investors. At the outset we would observe that, while the individuals who are parties to the guaranty agreement and the amendment thereto denominate themselves "guarantors," they are not guarantors in the sense of having guaranteed any indebtedness running from the joint venture to Investors. The joint venture agreement, as from time to time amended and extended, simply spelled out the contractual relationship between the coventurers, and did not create any relationship, other than that of a coventurer in a joint venture, between Investors and the joint venture. Cf. sec. 707(a).

It is clear from the record that the parties to the joint venture agreement intended Investors' role to be that of investor, and Sherwood-Quadrant's role to be essentially that of developer and promoter. As section 1.707–1(a), Income Tax Regs., provides, "the substance of the transaction will govern rather than its form," and there is no question but that, from Investors' point of view, the substance of its position was not that of a lender. Consequently, any transfer of money by the joint venture to Investors would have been treated as a distribution, not a payment of interest. Sec. 1.707–1(a), Income Tax Regs.; *Commissioner v. Banfield*, 122 F.2d 1017 (9th Cir. 1941).

Having determined that there was no indebtedness from the joint venture to Investors which the Guarantors could have guaranteed, it follows that the $130,000 paid by the Guarantors to Investors was not paid by them as guarantors of an indebtedness. Cf. *Rushing v. Commissioner*, 58 T.C. 996 (1972). The question then is, did the guaranty agreement and the amendment to guaranty agreement create a direct debtor-creditor relationship between Guarantors and Investors? We hold that it did.

This Court recently considered the scope of section 543(a)(1) as it pertains to "interest." In *Lake Gerar Development Co. v. Commissioner*, 71 T.C 887 (1979), we held that "section 543(a)(1), which defines, 'personal holding company income' as 'the portion of the adjusted ordinary gross income which consists of * * * interest' also includes interest as defined in section 61, except for certain adjustments." For reasons hereinafter stated, we find the payment in question to be interest under both sections of the Code.

Notwithstanding the use of labels such as "guarantor," "interest," etc., by the parties to the various transactions, it is clear that the true nature of the guaranty agreement signed on November 5, 1969, was an assurance by the Guarantors of a minimum cash flow to Investors in exchange for its consent to the sale by the Guarantors of their stock in Sherwood-Quadrant. Thus a direct, but contingent, liability on the part of the Guarantors was created.

Investors received no cash flow from the joint venture as of December 31, 1973, which was the date to which the termination agreement had originally been extended. Under the terms of the guaranty agreement, Guarantors were required to perform in accord with the agreement as of that date. However, for reasons not made clear by the record, the joint venture agreement was further extended to May 31, 1974, and beyond that date, and Investors forewent the exercise of its rights until December 30, 1974, at which time the parties entered into the amendment to guaranty agreement. In that agreement, the Guarantors agreed "to make a payment on said interest in the amount of $130,000 on the date of this Agreement and to pay the balance of said interest in the amount of $100,030.23 on January 2, 1975." In the "Recitals" it is also stated that "the parties desired to arrange for the payment of interest as required by the Guaranty." Thereafter, Guarantors were to continue to pay to Investors interest at the rate of 6 percent per annum on the principal from time to time remaining outstanding until December 31, 1978, when the then-outstanding balance of the guaranteed sum, together with interest thereon, was stated to be due and payable in full. The consideration flowing to the Guarantors was apparently Investors' agreement to permit the joint venture to continue until the end of 1978.

The guaranty agreement and the amendment to guaranty agreement, taken together, leave little doubt that by means of the 1974 amendment the parties thereto intended to create a primary liability on the part of the Guarantors for the payment of principal and interest, in return for which Investors forewent its right to terminate the joint venture in 1974. The price extracted by Investors in 1974 for a continuation beyond that date to the end of 1978 was an unconditional agreement by the Guarantors to pay accrued interest of $230,030.23, a part of which included the $130,000 paid on December 31, 1974.

The payments required under these agreements cannot be conceptualized as mere advances on the payment of the minimum cash flow which Investors was entitled to receive under the joint venture agreement, because there could be no assurance that the joint venture would ever be sufficiently successful to make such payments. The 1974 amendment elevated Guarantors' obligation from a contingent one to an unconditional and legally enforceable obligation for the payment of money; i.e., a debt. *Autenreith v. Commissioner*, 115 F.2d 856 (3d Cir. 1940). The parties to the 1974 amendment clearly intended this result, and Guarantors quite likely fully intended to deduct their payments as interest.

Under these circumstances, we have no choice but to hold for respondent notwithstanding the fact that in this, as in other situations, the personal holding company provisions have proved to be a trap for the unwary.

Investors urges that *Deputy v. DuPont*, 308 U.S. 488 (1940), and *McCoy-Garten Realty Co. v. Commissioner*, 14 B.T.A. 853 (1928), present analogous situations. We fail to see how either decision helps Investors. In each of those cases, the taxpayers urged that dividends which they were required to repay under guaranty agreements actually constituted interest on an indebtedness. In each case, the Court held that what the parties had called "dividends" were, indeed, dividends and were not payments of interest. We cannot perceive how these decisions could be of benefit to Investors, for similarly, we find that what the parties called interest and dealt with as interest was, in fact, interest.

*Decision will be entered for the respondent.*