**INVESTORS INSURANCE AGENCY, INC., Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 79–7590.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1981.

Decided May 26, 1982.

Rehearing and Rehearing En Banc Denied July 8, 1982.

---

F. A. LeSourd, Patten, Fleming, Hartung & Emory, Seattle, Wash., for petitioner-appellant.

Robert T. Duffy, Dept. of Justice, Washington, D. C., for respondent-appellee.

Before WRIGHT and NORRIS, Circuit Judges, and HATFIELD,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

The Commissioner of Internal Revenue (Commissioner) assessed Investors Insurance Agency, Inc. (Taxpayer) with a deficiency when it determined that $130,000 interest received by taxpayer in 1974 triggered the provisions of the personal holding company tax. 26 U.S.C. § 541. The Tax Court affirmed the deficiency assessment, rejecting taxpayer's argument that the $130,000 was not interest. *Investors Insurance Agency, Inc. v. Commissioner*, 72 T.C. 1027 (1979). We affirm.

In 1963, taxpayer entered into a joint venture with Sherwood Development Co. (Sherwood) to develop a large residential tract. Sherwood managed the joint venture, and taxpayer contributed $350,000 for property acquisition. The joint venture agreement gave taxpayer the right to veto any change in ownership of Sherwood and to terminate the joint venture if one of Sherwood's key stockholders sold his interest.

In 1969, the Sherwood stockholders negotiated an exchange of their stock for Weyerhaeuser stock. Taxpayer consented to the exchange in return for a personal guarantee from the stockholders that if the joint venture had distributed no profits by the end of 1973, the stockholders would pay taxpayer its initial investment plus 6% simple annual interest from 1963. Any distributions by the joint venture would reduce the stockholder's liability.

Since the joint venture made no distributions through 1973, the stockholders owed taxpayer the $350,000 initial investment and $230,030.23 in interest. Stockholders and taxpayer negotiated a new agreement providing for payment of the interest in two installments, 1974 and 1975, and postponement of the principle payment to 1978.

On December 31, 1974, the stockholders paid taxpayer $130,000 in interest, which taxpayer reported as such on its 1974 tax return. Both parties agree that if this amount is interest, taxpayer is subject to the § 541 personal holding company tax.

The Tax Court rejected taxpayer's argument that the $130,000 was merely a return on its capital investment in the joint venture. Taxpayer asserted that the 1969 agreement between it and the Sherwood stockholders was a guaranty by the latter of joint venture distributions. Joint venture distributions would have been a return

* Of the District of Montana.

on capital, not interest. Therefore, taxpayer argued that payment by guarantors of the promised distributions could not be interest, either.

The Tax Court found that the 1969 agreement created not a secondary, guarantor liability in the stockholders, but a direct, although contingent, liability. This liability became a legally enforceable obligation in 1974 when no distributions had been made and the stockholders became liable for the amounts agreed to. Since the amounts were not a return on capital, the Tax Court found them to be interest.

■ We agree that the 1969 agreement did not create a secondary guaranty relationship on the part of the stockholders. The joint venture owed taxpayer nothing. There was nothing for the stockholders to guarantee. *Cf. Golder v. C. I. R.*, 604 F.2d 34 (9th Cir. 1979) (traditional guaranty by owners of closely held corporation of the corporation's debt). The stockholders' liability was primary.

While not conceding the Tax Court's finding that the 1974 agreement elevated a contingent debt to an unconditional one, taxpayer argues that, even if a debt existed in 1974, the "interest" cannot be interest because it accrued during a period when no debt existed. For this argument, taxpayers cite numerous cases holding that for interest to be deductible under the Code, it must be paid for the use of money loaned, i.e., there must be a debt. *See, e.g., Deputy v. DuPont*, 308 U.S. 488, 494, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940).

While we agree with the principle, we disagree with taxpayer's application. Analysis of the pre-debt interest issue requires two inquiries. We must decide first, whether the joint venturers intended these amounts to be interest and second, whether that intention can be honored where the interest relates to periods before the debt existed or became unconditional. *Dunlap v. Commissioner*, 74 T.C. 1377 (1980), *rev'd on other grounds*, 82–1 U.S.T.C. ¶ 9195 (8th Cir. 1982).

On the first issue, we are influenced by the joint venturers' consistent labeling of the payment as interest and taxpayer's report of it as interest on its tax return. "As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction." *In re Steen*, 509 F.2d 1398, 1402 n.4 (9th Cir. 1975).

■ We agree that the character of a payment for tax purposes should be determined by the substance of a transaction rather than its form. Taxpayer, however, offers no other plausible explanation of the transaction than the loan agreement it appears to be. Taxpayer's argument that the money represents consideration for its permission to the Sherwood stockholders to exchange their stock for Weyerhaeuser stock, does not change the interest payments into a return of capital.

Taxpayer had the right to terminate the joint venture when the Sherwood stockholders proposed to sell their stock. It left its investment in the joint venture only on the stockholders' promise that the investment would be repaid along with a reasonable return for its use. The substance of the agreement is no more than a conversion of the original investment to a loan with interest.

Furthermore, if, as taxpayer argues, the 1969 agreement was consideration, we fail to see how it could also be contingent. The liability or obligation was unconditional. Only the amount was subject to variance. We do not need to decide this issue, however.

The joint venturers intended the $230,-030.23 to be interest. It accrued on a debt which became legally enforceable in 1974 at the latest. We honor the joint venturers' intention that this be interest even though it was calculated on the basis of 6% per year from 1963, the date of the original investment.

We find the situation indistinguishable from that in *Commissioner v. Philadelphia Transportation Co.*, 174 F.2d 255 (3d Cir. 1949) and *Commissioner v. Columbia River Paper Mills*, 126 F.2d 1009 (9th Cir. 1942). In those cases, corporations issued bonds several months after their stated dates and paid interest back to the stated dates. The

Commissioner disallowed the interest deductions for the period prior to issue, arguing that no debt existed at that time.

The courts found it immaterial that the interest was *calculated* from a period prior to the bonds' issuance. The interest *accrued* when it was paid and was deductible in the year it *accrued*. *Commissioner v. Philadelphia Transportation Co.*, 174 F.2d 255, 256 (3d Cir. 1949); *Commissioner v. Columbia River Paper Mills*, 126 F.2d 1009, 1010 (9th Cir. 1942).

"In short, the situation is one where the parties to the transaction . . . have agreed on the one hand to pay, and on the other hand to accept, a definitely ascertainable sum as compensation for the use of money over a stated period of time." *Id.* at 1010. The $230,030.23 of which the $130,000 was the first installment, was the agreed upon sum for the use of the $350,000. It matters not how it was calculated. The interest accrued no later than 1974 when the debt became unconditional in obligation and amount. *See also Monon Railroad v. C.I.R.*, 55 T.C. 345 (1970).

The $130,000 was interest and properly triggered the personal holding company tax. The judgment is AFFIRMED.

NORRIS, Circuit Judge, dissenting:

Under the rubric of honoring the intentions of the parties, the majority today subjects a taxpayer to a tyranny of labels.[1]

The Commissioner offers no coherent theory to support his characterization of the $130,000 payment as interest,[2] and the majority does no better. With virtually no exploration of the economic substance of the 1963 Joint Venture Agreement or the 1969 Amendment to that agreement, the majority concludes that because the parties calculated the payment as 6% of $350,000 and labeled it in their dealings as interest, it should be treated as interest for tax purposes.

I readily concede that the payment is not easily characterized. It is elemental, however, that the character of a payment for tax purposes is determined by the substance of the transaction, *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 493, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1937), not by the method of calculation or the labels attached by the parties. *See Helvering v. Richmond F. & P. R. Co.*, 90 F.2d 971, 973–74 (4th Cir. 1937); *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940). When dealing with the personal holding company statute, which imposes a severe tax penalty on those who fall within its technical provisions, we should be hesitant to blindly saddle taxpayers with contract language that happens to survive the crucible of negotiations. *See Parkside Inc. v. Commissioner*, 571 F.2d 1092, 1096–97 (9th Cir. 1977).

I

Because the majority gives sketchy treatment to the facts, I review them here. In 1963, Investors and Sherwood Development Co. (Sherwood) entered into a joint venture agreement (1963 Agreement) for the purpose of acquiring, developing and selling

1. *See Snyder v. Massachusetts*, 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1933) (Cardozo, J.).

2. In his brief, the Commissioner argued that the 1969 Agreement created a debt on the part of Guarantors in the principal amount of $350,-000. At oral argument, the Commissioner abandoned this position, conceding that the 1969 Agreement created only a contingent liability, which would mature into a debt in 1973 to the extent the joint venture failed to distribute the full amount guaranteed by the 1969 Agreement. The Commissioner then adopted the position that, unlike § 163(a), § 543 contains no requirement of an underlying indebtedness, and that the $130,000 payment was inter-est because made in consideration of the joint venture's use of Investors' money. Simultaneously, however, the Commissioner conceded (and the majority apparently accepts that concession, *see*, *ante*, at 1329–1330) that he would view all payments from the joint venture, including any made after 1969 and calculated to return 6% on Investors' $350,000 investment, as distributions, not interest. The Commissioner did not explain how, assuming no underlying indebtedness on the part of either the joint venture or Guarantors, he would distinguish for tax purposes between payments by the joint venture representing a 6% return on Investors' original capital investment and payments by Guarantors that have the identical economic effect.

**1332**

certain real property. The agreement recited that Investors would provide $350,000 for property acquisition and development, and Sherwood would manage and operate the joint venture. Distributions from the joint venture were to be made as follows: first, to Investors, an amount equal to its capital investment in the joint venture, "but without interest;" second, to Sherwood, $50.00 per residential lot sold, and to Investors, 6 per cent simple annual "interest" on its capital investment, calculated from the date of investment to the date of repayment; third, to Investors and Sherwood equally.[3]

As of late 1969, the joint venture had made no distributions. At that time, Dick and Ruby Willard and George and Florence Bell (Guarantors), who then owned all outstanding Sherwood stock, negotiated with the Weyerhaeuser Company to exchange their Sherwood stock for Weyerhaeuser stock. Under the original 1963 Agreement, however, Investors had the contractual right to veto any change in ownership of Sherwood. In addition, the 1963 Agreement provided that if George Bell sold his interest in Sherwood, Investors could terminate the joint venture and purchase Sherwood's interest.

To accomplish the substitution of Weyerhaeuser for Guarantors as owners of the Sherwood stock, Guarantors and Investors negotiated a new and separate agreement (1969 Agreement). Investors therein consented to the proposed transfer of stock to Weyerhaeuser in exchange for Guarantors' promise that it would assure Investors' recovery of its original capital investment in the joint venture, plus a 6% annual return, which the parties again labeled as "interest." Specifically, Guarantors promised to pay Investors on December 31, 1973 the sum of $560,000 ($350,000 plus 6% simple annual "interest" from the date of Investors' original 1963 investment, to the date of payment), *if* at that time the joint venture had made no distributions. Thus, Guarantors' obligation to Investors under the 1969 Agreement was contingent and would be discharged as the joint venture made distributions pursuant to the 1963 Agreement.

Restated, Guarantors promised that Investors would receive, from either the joint venture or Guarantors, no later than December 31, 1973, $476,000 ($350,000 plus 6% of $350,000 annually from 1963 to 1969), plus $21,000 per year (6% of $350,000 or 4.4% of $476,000) for each year between 1969 and 1973 that the joint venture made no distributions. If the joint venture made distributions, the incremental annual amounts for 1969 to 1973 (calculated as 6% of the outstanding balance of Investors' original $350,000 investment) would be reduced, reaching zero when the joint venture had distributed to Investors a total of $350,000.[4] The 1969 Agreement also recited that it did not alter Investors' right under the 1963 Agreement to share in joint venture profits.

As a result of the joint venture's failure to make any distributions by December 31, 1973, Guarantors' contingent obligation matured into an unconditional obligation to pay Investors $560,000. A year later, when the joint venture still had made no distributions and Guarantors had made no payments to Investors, Guarantors and Investors executed an amendment to the 1969 Agreement (1974 Amendment). Reciting that the parties desired to arrange for the payment of "interest" as required by the 1969 Agreement, the 1974 Amendment provided for immediate payment of $230,030.23 from Guarantors to Investors. That payment, calculated as 6% of $350,000 annually from 1963 (the date of Investors' original

---

**3.** As amended in 1968, the 1963 Agreement provided for termination of the joint venture on December 31, 1973.

**4.** Under the 1963 Agreement, joint venture distributions were to go first to repay Investors' original $350,000 investment. Thus, if the joint venture had distributed $100,000 in 1970, the incremental amount due for 1971 under the 1969 Agreement would have been calculated as 6% of $250,000; if, however, the joint venture had distributed $350,000 immediately upon execution of the 1969 Agreement, no additional amounts would have accrued, and Guarantors' remaining contingent obligation would have been $126,000.

investment in the joint venture) to 1974 (the date of payment), was to be made in two installments: $130,000 on December 31, 1974, and $100,030.23 on January 2, 1975. Additionally, the 1974 Amendment recited that the outstanding balance due under the 1969 Agreement ($350,000), less the sum of any future joint venture distributions, would become due and payable on December 31, 1978, and that Guarantors would make semiannual interest payments on that balance (at 6% per year) beginning July 1, 1975. The original 1963 Agreement was simultaneously amended to extend the joint venture to December 31, 1978.

## II

The term "interest," as used in the Internal Revenue Code, is construed according to its ordinary business meaning. *Deputy v. Du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940). The Supreme Court has defined interest both as "the amount which one has contracted to pay for the use of borrowed money," *Old Colony Railroad Co. v. Commissioner*, 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), and, more broadly, as "compensation for the use or forebearance of money." [5] *Deputy v. Du Pont*, 308 U.S. at 498, 60 S.Ct. at 368; *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965); *see Mayflower Investment Co. v. Commissioner*, 239 F.2d 624, 625 (5th Cir. 1956) (personal holding company case).

For interest to accrue, at least within the meaning of § 163(a) (the interest deduction provision), there must be an underlying indebtedness. *See Deputy v. Du Pont*, 308 U.S. 488, 497–98, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940); *Golder v. Commissioner*, 604 F.2d 34, 35 (9th Cir. 1979). An indebtedness is an "unconditional and legally enforceable obligation for the payment of money." *Au-*

*tenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir. 1940). The mere possibility that a debt may arise in the future is not an indebtedness on which interest can accrue for purposes of the income tax deduction. *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir. 1976).

## III

### A

There is no dispute over the nature of the 1963 Agreement. By the terms of that agreement, Investors became a joint venturer with an equity interest in the joint venture. Thus, notwithstanding the recital that certain distributions would include 6% "interest" on Investors' capital investment, any cash payments from the joint venture to Investors prior to 1969 would have been treated as a distribution, not as interest. *See Commissioner v. Banfield*, 122 F.2d 1017, 1018 (9th Cir. 1941). The Commissioner concedes as much.[6]

The 1969 Agreement in turn had the effect of contractually assuring Investors that it would recover its original $350,000 investment plus a 6% annual return. It is simplistic, however, to conclude that the 1969 Agreement created a debt in the principal amount of $350,000, bearing interest at 6% since 1963, simply because the parties used those numbers and that date as reference points in striking their bargain.

The 1969 Agreement was negotiated because Guarantors wished to exchange their interest in the joint venture for Weyerhaeuser stock, but could not do so without Investors' consent. Investors gave its consent in return for Guarantors' promise that Investors would be paid a minimum amount, either by the joint venture or by Guarantors, no later than 1973. The minimum amount[7] that Investors was contrac-

---

5. The broader definition "makes it clear that interest frequently arises from transactions which involve no contracts, such as tax liabilities or judgments." M. Asimow, *The Interest Deduction*, 24 U.C.L.A.L.Rev. 749, 751 n.14 (1977). *See 320 East 47th St. Corp. v. Commissioner*, 243 F.2d 894, 896–97 (2nd Cir. 1957) ("interest" is not limited to compensation for money voluntarily loaned, but includes compensation for money withheld).

6. *See, supra*, footnote one.

7. It was a minimum amount because Investors retained its contractual right as an original investor to participate in any additional joint venture distributions made under the original 1963 Agreement.

tually entitled to receive—$476,000 if paid immediately in 1969 and $560,000 if not paid until 1973—was calculated by reference to the distribution priority schedule of the 1963 Agreement and was designed to return Investors' original $350,000 investment plus 6% per year dating back to 1963. Although the parties labeled the 6% payments as "interest"—just as they originally labeled a portion of the joint venture distributions as "interest"—the 6% factor did not represent an actual rate of interest; rather, it represented a negotiated amount that Guarantors conditionally promised to pay in consideration of Investors' consent to the change in ownership of Sherwood. Thus, to determine whether any or all of the $130,000 payment was in substance "compensation for the use or forebearance of money," I look behind the calculations to the economic realities of the 1969 Agreement.

From that perspective, the characterization of the $130,000 payment turns on whether the 1963 Agreement and the 1969 Agreement are viewed as creating separate and independent obligations to Investors, or whether the two agreements are viewed in terms of their combined effect on Investors' economic position.

Viewing the obligations first as separate and independent, I find that neither the joint venture nor Guarantors had an uncon-

ditional obligation in 1969 to pay Investors a fixed sum of money. The 1963 Agreement established distribution priorities but created no fixed obligation of the joint venture to make distributions. Similarly, the 1969 Agreement created only a contingent obligation on the part of Guarantors—i.e., an obligation to pay a sum in 1973 that could vary between zero and $560,000, depending upon the amount of joint venture distributions.[8] Arguably, then, there was no "unconditional and legally enforceable obligation for the payment of money," *Autenreith*, 115 F.2d at 858, on which interest could accrue before December 31, 1973,[9] when Guarantors' contingent obligation matured into an unconditional obligation to pay Investors $560,000.[10] Cf. *Burton v. Bowers*, 172 F.2d 429, 432 (4th Cir. 1949) (payment calculated with respect to period prior to declaration of preferred dividend is not deductible as "interest," because no indebtedness arose until dividend declared); *Williams v. Commissioner*, 47 T.C. 689 (1967) (payment made at time of reinstatement of lapsed insurance policy, and designated as "interest" on back premiums, was cost of reinstating policy, not deductible interest, because there was no underlying indebtedness).

Viewed, on the other hand, in terms of their combined effect on Investors' econom-

---

8. The majority, with no supporting analysis, rejects the characterization of Guarantors' obligation as contingent. In so doing, the majority ignores both the finding of the Tax Court, 72 T.C. at 1032, *see, infra*, n.9, and the Commissioner's concession at oral argument. I fail to see any inconsistency in characterizing Guarantors' promise to Investors as "consideration," while also characterizing the liability created by the promise as contingent. Obviously, Guarantors' obligation to make *any* payment pursuant to the promise was contingent on the amount of joint venture distributions.

9. A hypothetical illustrates that an obligee may have a current unconditional right to a future sum certain with no accrual of interest. Investors might have independently contracted with a third party (unrelated to Guarantors, Weyerhaeuser or the joint venture) to pay $100,000 in five years *if* the joint venture did not distribute at least that amount in that time. To "purchase" such an "insurance policy," Investors would have to pay the third party an amount that compensated the third party for the risk

that the joint venture might not pay off. Under the hypothetical, both the third party and the joint venture would have *contingent* liabilities, yet Investors would have an unconditional right to $100,000 in five years, with the possibility of pre-payment if the joint venture became profitable in the interim. We doubt that the IRS would seek to combine these independent transactions and treat them as creating one interest bearing obligation.

10. There can be no dispute that a debt came into existence at that time. The Tax Court followed this line of analysis, but concluded that a debt did not arise until 1974, when Guarantors became unconditionally obligated to pay $230,030.23, pursuant to the 1974 Amendment. The Tax Court then held that because a debt existed, the $130,000 payment was interest. The Tax Court offered no explanation why the fact that a $230,030.30 debt arose in 1974 necessarily meant that the payment was interest rather than principal.

ic position, the 1963 and 1969 Agreements created an unconditional right in Investors to receive prescribed future payments. When so viewed in combination, the two obligations take on the economic characteristics of a single interest bearing obligation to Investors.[11] Although it was uncertain in 1969 whether the joint venture, Guarantors or both would ultimately make the payments guaranteed by the 1969 Agreement, there was no uncertainty about Investors' right to receive the payments. Investors had an unconditional right to receive, by December 31, 1973, $476,000 plus $21,000 for each year between 1969 and 1973 that Investors received no distributions from the joint venture. Those $21,000 annual increments were implicitly the consideration agreed to by the parties for deferral of payment on the $476,000 principal obligation—i.e., "compensation for the use or forbearance of money"—and, as such,

are fairly characterized as interest income to Investors.[12]

### B

Under either view, Investors earned too little interest in 1974 to qualify as a personal holding company.[13] To find otherwise, as the majority does, I would have to conclude that the entire amount calculated as 6% of $350,000, including that calculated from 1963 to 1969, is interest. However appealing the simplicity of that conclusion, it ignores the economic character of that portion of the guaranteed payment.[14]

Relying on *Commissioner v. Philadelphia Transportation Co.*, 174 F.2d 255 (3d Cir. 1949), and *Commissioner v. Columbia River Paper Mills*, 126 F.2d 1009 (9th Cir. 1942), the majority reasons that the absence of any underlying indebtedness during the 1963 to 1969 period is irrelevant to the character of the payment, because the "in-

---

**11.** "A debt instrument ordinarily contains an unconditional obligation to pay a principal sum certain, on or before a fixed maturity date not unreasonably far in the future, with interest payable in all events and not later than maturity." B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 4.03 (4th Ed. 1979).

**12.** Because the joint venture made no distributions, Guarantors actually paid 4.41% simple annual interest on $476,000.

**13.** The $130,000 payment in issue, made on December 31, 1974, was the first of two payments Guarantors made pursuant to the 1974 Amendment. The sum of the two payments ($230,030.23) was determined by taking 6% of $350,000 for each year from 1963 to 1974. Under the analysis most favorable to the Commissioner, $105,000 (6% of $350,000 calculated from 1969 to 1974) of the $230,030.23 payments can be characterized as interest. The balance—$125,030.23 (calculated as 6% of $350,000 from 1963 to 1969)—represents a partial payment of the $476,000 principal obligation. Prorating principal and interest between the two payments (which were made within two days of each other and calculated by the parties as a single amount due), the $130,000 payment included, at most, $59,340 in interest. Investors received an additional $1,236 of interest from another source and, thus, had total personal holding company income of $60,576. Since that amount is less than 60% of Investors' 1974 adjusted ordinary gross income ($132,224), Investors should not be held liable

for a personal holding company tax on its 1974 income. *See* I.R.C. § 541.

**14.** Nor does the majority advance the policies of the personal holding company statute by characterizing the $126,000 amount as § 543 interest. The personal holding company tax was enacted to remedy the evil of the "incorporated pocketbook," *Morris Investment Corp. v. Commissioner*, 134 F.2d 774, 775 (3d Cir.), cert. denied, 320 U.S. 743, 64 S.Ct. 43, 88 L.Ed. 440 (1943), whereby high-bracket taxpayers use the corporate form of organization to hold their income-producing assets for the sole purpose of shielding their personal income from the graduated income tax. *See* H.R.Rep. No. 704, 73d Cong., 2d Sess. (1934); Bittker and Eustice, *supra*, ¶ 8.20. In defining personal holding company income, Congress evidently sought to distinguish passive income, deemed the equivalent of shareholders' personal income, from earned income. *See id.*

It is undisputed that from 1963 to 1969 Investors had an equity interest in an active business venture. Investors' money was "at risk," and there is no evidence that the shareholders of Investors had incorporated for the sole purpose of avoiding the personal income tax. Whatever the character of the incremental amounts calculated from 1969 to 1973, no portion of the $476,000 principal amount can fairly be characterized as passive income generated by the income-producing assets of Investors' shareholders. On the contrary, the corporation itself "earned" the right to that amount through a negotiated exchange with Guarantors.

terest" did not "accrue" until 1974. The majority's reliance on those cases is misplaced. *Columbia Mills* and *Philadelphia Transportation* involved the deductibility of interest that had been calculated over a period of months prior to the issue date of bonds. In each case, it was clear on the face of the transaction that the pre-issue payment was "compensation for the use or forbearance of money"—i.e., interest. *See Columbia Mills*, 126 F.2d at 1010. The real issue in each case was whether the interest payment was deductible even though calculated with reference to a period that preceded the creation of an indebtedness. In ruling that it was, the court in *Philadelphia Transportation* distinguished between the period of calculation of interest and the date of its accrual. 174 F.2d at 255. The majority seizes on that distinction here, without first examining whether, as a matter of economic substance, the amount calculated as 6% of $350,000 from 1963 to 1969 can fairly be characterized as "compensation for the use or forbearance of money." In my view it cannot.

During the 1963 to 1969 period, neither Guarantors nor the joint venture owed Investors $350,000 or any other amount on which interest was or would become due. Nor, in 1969, did Investors loan $350,000 to Guarantors or the joint venture or otherwise forbear on the right to receive that amount. Rather, Investors released certain contractual rights, of indeterminate value, in return for Guarantors' promise that Investors would receive a minimum return of $476,000. However that amount was calculated and labeled, it remains, quite simply, a contractual payment made to secure Investors consent to the exchange of Sherwood stock. *See Williams v. Commissioner*, 47 T.C. at 692.

I find perplexing the majority's bald assertion that the 1969 Agreement converted Investors' original investment to a loan with interest. Investors did not convert its original investment into anything; the undisputed fact is that Investors retained its full equity position in the joint venture—a position that had been obtained by Investors' original $350,000 capital investment. Moreover, the majority's theory that the 1969 Agreement converted Investors' equity interest in the joint venture to a debt is undermined by the majority's own concession that a debt may not have arisen until 1974.

In sum, I find no economic basis for characterizing the payment calculated as 6% of $350,000 from 1963 to 1969 as "compensation for the use or forbearance of money." The payment was made in partial discharge of a conditional promise to pay a minimum of $476,000 in consideration of Investors' consent to the transfer of stock. To be sure, the parties struck their bargain at a minimum of $476,000 by adding 6% per annum to the amount of Investors' original capital investment in the joint venture. I know of no principle of law, however, that requires us to treat a contractual payment as a payment of interest, simply because the parties labeled the payment as "interest," and used a base amount and an annual percentage as reference points in making their deal. The fact remains that no part of the $476,000 was interest, just as no part of joint venture distributions would have been interest, notwithstanding contract language labeling a portion of the distributions as "interest."